# .WHITNEY *v.* TAYLOR.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF CALIFORNIA.

No. 278. Argued April 10, 1895. — Decided April 29, 1895.

In May, 1854, J. settled on a quarter section of public land in California, which had not been then offered for public sale, and improved it. Before May, 1857, the government survey had been made and filed; showing the tract to be agricultural land, not swamp or mineral, and not embraced within any reservation. · In · May, 1857, J. duly declared his intention to claim it as a preëmption right under the act of March 3, 1853, c. 145, 10 Stat. 244, and paid the fees required by law, and the filing of this statement was duly noted in the proper government · record. J. occupied the tract until about 1859, when he left for England, and never returned. The land was found to be within the granted limits of the grant to the Central Pacific Railroad Company, by the act of July 1, 1862, c. 120, 12 Stat. 489. That company filed its map of definite location March 26, 1864, and fully constructed its road, by July 10, 1868. It demanded this ·tract and the Land Office denied the claim. In 1885 the preëmption entry of J. was cancelled. On August 28, 1888, T. made entry of the premises under the homestead laws of the United States, and subsequently commuted such entry, made his final proofs, paid the sum of $400, took the government receipt therefor, and entered into possession. *Held:*

(1) That the tract being subject to the preëmption claim of J. at the time when the grant to the railroad company took effect, was excepted from the operation of that grant;

(2) That after the cancellation of that entry it remained part of the public domain, and, at the time of the homestead entry of T. was subject to such entry.

THE controversy in this case is in respect to the title to the southeast quarter of section 33, township 12 north, range 7 east, Mount Diablo meridian, in the State of California. The land is within the granted limits of the Central Pacific Railroad Company, Act of July 1, 1862, c. 120, 12 Stat. 489, and the plaintiff claims under and by virtue of mesne conveyances from that company. The company filed its map of definite location on March 26. 1864, and fully constructed its road by

the 10th of July, 1868. It demanded, but never received a patent.

.The title of the defendant rests, on the following facts: On May 28, 1857, one Henry H. Jones, having paid the fees required by law in such cases, filed his preëmption declaratory statement in the land office having jurisdiction over the premises, which declaratory statement was in the words and figures following:

"I, Henry H. Jones, of Placer County, being an American citizen, over the age of twenty-one years, and a single man, have, on the 16th day of January, 1854, settled and improved the southeast quarter of section No. thirty-three, 33, of township No. twelve north, 12 N., of range No. seven east, 7 E., Mt. Diablo meridian, in the district of lands subject to sale at the land office at Marysville, California, containing one hundred and sixty acres, which land has not yet been offered at public sale, and thus rendered subject to private entry; and I do hereby declare my intention to claim the said tract of land as a preëmption right under the provisions of an act of Congress of 3d day of March, 1853.

"Witness my hand this 22d day of May, A.D. 1857

                                    "HENRY H. JONES.

"In presence of V. E. REMINGTON."


The filing of this statement was duly noted in the proper volume of tract books in the land office, and was the only record claim to the premises prior to the time when the line of the Central Pacific Railroad was definitely fixed. The government survey was made intermediate the settlement by Jones in 1854 and the filing of this statement. On April 18, 1856, a return of the official plat of such survey was made by the surveyor-general for the State of California to the General Land Office at Washington, and during the same year a duplicate copy thereof was filed in the local land office. By such survey and return all the land in the township, including the premises in question, was ascertained and returned as agricultural and not mineral or swamp land, and not embraced in any government reservation. On June 30, 1858, the President

issued his proclamation for the sale of lands in that land district, this tract included, naming February 14, 1859, as the time for the opening of the sale, and notifying all preëmption claimants that their rights would be forfeited unless prior to such date they should establish their claims and pay for the lands they had given notice of their intention to preëmpt. The proclamation further declared that " no mineral lands or tracts containing mineral deposits are to be offered at the public sales, such mineral lands being hereby expressly excepted from sale or other disposal pursuant to the requirements of the act of Congress, approved March 3, 1853." The land officers under this authority withheld from offer and sale all of section 33, stating in their report, dated March 13, 1859, that the land was reserved as mineral land.

Some time after the filing of the map of definite location the railroad company commenced proceedings against Jones to have his declaratory statement cancelled. The decision of the local land officers, adverse to Jones, was transmitted to the Commissioner of the General Land Office, who, on December 23, 1886, affirming their decision, held that " at the date when the route of the C. P. R. R. Co. was definitely fixed a preëmption claim had attached thereto, that of Jones, and as the grant to said company expressly provided that lands to which a preëmption claim had not attached were granted, it follows that lands to which such a claim had then attached were not granted. *K. P. R. R. Co.* v. *Dunmeyer,* 113 U. S. 629, and *U. S.* v. *U. P. R. R. Co.,* 12 Copp, 161. That Jones's claim has been found to have been abandoned or invalid cannot operate to the railroad company's advantage, for the granting act did not provide that lands to which an unabandoned or valid preëmption claim may not have attached were granted, but only that lands to which a preëmption claim may not have attached were granted. The claim of Jones had attached when the railroad was definitely located, and, whether valid or invalid, excepted the land from the grant. The tract in question is, therefore, held to be subject to disposal as public land."

This decision was affirmed by the Secretary of the Interior

on July 17, 1888. On August 28, 1888, the defendant made entry of the premises under the homestead laws of the United States. Subsequently, he commuted such homestead entry under section 2301, Rev. Stat., made his final proofs, paid the sum of $400, and obtained the government receipt therefor. With reference to the occupation and improvement of the premises by Jones this is the finding of the trial court:

"That Jones, from the time that he alleged settlement, in 1854, up to about 1859, cut some hay off from about four acres of the land in controversy, which he had enclosed with a brush fence. Jones cut off the brush on the ground in controversy to enable him to make the fence. At that time the country was open and Jones pastured his cattle and sheep on the land in controversy, as well as over the surrounding country, but he never settled upon the land in controversy. He lived on section 4 adjoining. At the time of Jones's settlement the lines of survey were not generally known. Jones subsequently left the country to visit England about 1859, the exact date not being fixed, and never returned. His record filing remained intact on the records of the land office until cancelled [in 1885], as hereinbefore stated."

Upon the foregoing facts the Circuit Court held that the land in controversy was at the time of defendant's homestead entry part of the public domain of the United States and subject to disposal as public land, and, upon such conclusion, entered judgment in favor of the defendant. 45 Fed. Rep. 616.

*Mr. B. E. Valentine* for plaintiff in error.

*Mr. C. W. Holcomb* for defendant in error. *Mr. W. J. Johnston* was on his brief.

MR. JUSTICE BREWER delivered the opinion of the court.

This case turns upon the question whether on March 26, 1864, at the time of the filing by the railroad company of its map of definite location, the tract in controversy was public

land of the United States, and therefore passing under the grant to the company, or was excepted therefrom by reason of the previous declaratory statement of Jones. In *Kansas Pacific Railway* v. *Dunmeyer*, 113 U. S. 629, 644, one Miller had made a homestead entry on the land in controversy prior to the filing of the map of definite location. Thereafter he abandoned his homestead claim, and the contention was that such abandonment inured to the benefit of the company, and subjected the land to the operation of the grant, but this contention was denied, the court, holding that the condition of the title at the date of the definite location determined the question as to whether the land passed to the railroad company or not, and, distinguishing *Water and Mining Company* v. *Bugbey*, 96 U. S. 165, said in reference to a homestead claim:

"In the case before us a claim was made and filed in the land office, and there recognized, before the line of the company's road was located. That claim was an existing one of public record in favor of Miller when the map of plaintiff in error was filed. In the language of the act of Congress this homestead claim had *attached* to the land, and it therefore did not pass by the grant.

"Of all the words in the English language this word *attached* was probably the best that could have been used. It did not mean mere settlement, residence, or cultivation of the land, but it meant a proceeding in the proper land office, by which the inchoate right to the land was initiated. It meant that by such a proceeding a right of homestead had fastened to that land, which could ripen into a perfect title by future residence and cultivation. With the performance of these conditions the company had nothing to do. The right of the homestead having attached to the land it was excepted out of the grant as much as if in a deed, it had been excluded from the conveyance by metes and bounds."

In *Hastings & Dakota Railroad* v. *Whitney*, 132 U. S. 357, 361, these facts appeared: At the time of the filing by the plaintiff railroad company of its map of definite location there stood upon the records of the local land office a homestead entry of

Bently S. Turner. This entry was based upon an affidavit made by Turner, a soldier in the army of the United States, and actually with his regiment in the State of Virginia, which affidavit stated that Turner was the head of a family, a citizen of the United States and a resident of Franklin County, New York. It did not state that Turner's family, or any member thereof, was residing on the land, or that there was any improvement made thereon, and as a matter of fact no member of his family was then residing, or ever did reside, on the land, and no improvement whatever of any kind had ever been made thereon by any one. The application for the entry was made through one Conwell, whom Turner had constituted his attorney for that purpose. At the time of making this entry section 1 of the act of March 21, 1864, c. 38, 13 Stat. 35, Rev. Stat. § 2293, was in force, which authorized one, in the military or naval service of the United States, and, therefore, unable to do personally the preliminary acts required at the land office, whose family or some member thereof was residing on the land, and upon which a *bona fide* improvement and settlement had been made, to make the customary affidavit before his commanding officer, and upon that, the other provisions of the statute being complied with, to enter a tract of land as a homestead. It was held that notwithstanding the defects in the affidavit the tract was excepted from the scope of the grant, although the language of the granting act only excepted therefrom lands to which "the right of preemption or homestead settlement has attached," while the language of the granting act in the present case is "to which a preëmption or homestead claim may not have attached."

We quote from the opinion by Mr. Justice Lamar as follows: "In *Witherspoon* v. *Duncan*, 4 Wall. 210, this court decided, in accordance with the decision in *Carroll* v. *Safford*, 3 How. 441, that 'lands originally public cease to be public after they have been entered at the land office and a certificate of entry has been obtained.' And the court further held that this applies as well to homestead and preëmption as to cash entries. In either case, the entry being made and the certificate being executed and delivered, the particular land entered

thereby becomes segregated from the mass of public lands and takes the character of private property. The fact that such an entry may not be confirmed by the land office on account of any alleged defect therein, or may be cancelled or declared forfeited on account of non-compliance with the law, or even declared void, after a patent has issued on account of fraud, in a direct proceeding for that purpose in the courts, is an incident inherent in all entries of the public lands." And, after referring to the *Dunmeyer case*, in which it was said that the entry when made was valid, " counsel for plaintiff in error contends that the case just cited has no application to the one we are now considering, the difference being that in that case the entry existing at the time of the location of the road was an entry valid in all respects, while the entry in this case was invalid on its face and in its inception; and that this entry having been made by an agent of the applicant and based upon an affidavit which failed to show the settlement and improvement required by law, was, on its face, not such a proceeding in the proper land office as could attach even an inchoate right to the land. . . . But these defects, whether they be of form or substance, by no means render the entry absolutely a nullity. So long as it remains a subsisting entry of record, whose legality has been passed upon by the land authorities, and their action remains unreversed, it is such an appropriation of the tract as segregates it from the public domain, and therefore precludes it from subsequent grants. In the case before us, at the time of the location of the company's road, an examination of the tract books and the plat filed in the office of the register and receiver, or in the land office, would have disclosed Turner's entry as an entry of record, accepted by the proper officers in the proper office, together with the application and necessary money — an entry, the imperfections and defects of which could have been cured by a supplemental affidavit or by other proof of the requisite qualifications of the applicant. Such an entry attached to the land a right which the road cannot dispute for any supposed failure of the entryman to comply with all the provisions of the law under which he made his claim. A practice of allow-

ing such contests would be fraught with the gravest dangers to actual settlers, and would be subversive of the principles upon which the munificent railroad grants are based. As was said in the *Dunmeyer case, supra:* 'It is not conceivable that Congress intended to place these parties (homestead and preemption claimants on the one hand and the railway company on the other) as contestants for the land, with the right in each to require proof from the other of complete performance of its obligation. Least of all is it to be supposed that it was intended to raise up, in antagonism to all the actual settlers on the soil whom it had invited to its occupation, this great corporation with an interest to defeat their claims and to come between them and the government as to the performance of their obligations?' "

The same doctrine was applied in *Bardon v. Northern Pacific Railroad,* 145 U. S. 535, to a preëmption entry, though it is true that in that case payment had been made, and the final receipt issued prior to the filing of the map of definite location.

See also *Newhall* v. *Sanger,* 92 U. S. 761, in which case the mere existence of an alleged Mexican grant, valid or invalid, and the validity of which was under investigation before the proper tribunal at the time of the filing of the map of definite location of one of the Pacific roads, a beneficiary of the very act now before us, was held to exclude all lands within its boundaries from the operation of the congressional grant.

Although these cases are none of them exactly like the one before us, yet the principle to be deduced from them is that when on the records of the local land office there is an existing claim on the part of an individual under the homestead or preëmption law, which has been recognized by the officers of the government and has not been cancelled or set aside, the tract in respect to which that claim is existing is excepted from the operation of a railroad land grant containing the ordinary excepting clauses, and this notwithstanding such claim may not be enforceable by the claimant, and is subject to cancellation by the government at its own suggestion, or upon the application of other parties. It was not the inten-

tion of Congress to open a controversy between the claimant and the railroad company as to the validity of the former's claim. It was enough that the claim existed, and the question of its validity was a matter to be settled between the government and the claimant, in respect to which the railroad company was not permitted to be heard. The reasoning of these cases is applicable here. Jones had filed a claim in respect to this land, declaring that he had settled and improved it, and intended to purchase it under the provisions of the preëmption law. Whether he had in fact settled or improved it was a question in which the government was, at least up to the time of the filing of the map of definite location, the only party adversely interested. And if it was content to let that claim rest as one thereafter to be prosecuted to consummation, that was the end of the matter, and the railroad company was not permitted by the filing of its map of definite location to become a party to any such controversy. The land being subject to such claim was, as said by Mr. Justice Miller, in *Railway Company* v. *Dunmeyer, supra,* "excepted out of the grant as much as if in a deed it had been excluded from the conveyance by metes and bounds."

While not disputing the general force of these authorities it is insisted by plaintiff that this case is not controlled by them for these reasons: First, Jones never acquired any right of preëmption because he never in fact settled upon and improved the tract; second, the land was unsurveyed at the time of the alleged settlement, and the filing was not made "within three months after the return of the plats of surveys to the land office," (10 Stat. 246,) and was therefore an unauthorized act; third, that whether the filing was made in time or not, as it was not followed by payment and final proof within the time prescribed, all rights acquired by it lapsed, the filing became in the nomenclature of the land office an "expired filing," and the land was discharged of all claim by reason thereof.

With reference to the first of these reasons it is true that there must be a settlement and improvement in order to justify the filing of such a declaratory statement. Settlement

is the initial fact. The act of September 4, 1841, c. 16, 5 Stat. 453, which was in force at the time of these transactions, gave the right of preëmption to one making "a settlement in person," and who inhabits and improves the land and erects a dwelling thereon, (§ 10,) and authorized the filing of a declaratory statement within three months after the date of such settlement. (§ 15.) In this respect a preëmption differs from a homestead, for the entry in the land office is in respect to the latter the initial fact. Act of May 20, 1862, c. 75, 12 Stat. 392; Rev. Stat. § 2290; *Maddox* v. *Burnham*, 156 U. S. 544. But it is also true that settlement alone without a declaratory statement creates no preëmption right. "Such a notice of claim or declaratory statement is indispensably necessary to give the claimant any standing as a preëmptor, the rule being that his settlement alone is not sufficient for that purpose." *Lansdale* v. *Daniels*, 100 U. S. 113, 116. And the acceptance of such declaratory statement and noting the same on the books of the local land office is the official recognition of the preëmption claim. While the cases of *Kansas Pacific Railway Co.* v. *Dunmeyer* and *Hastings & Dakota Railway Co.* v. *Whitney, supra,* involved simply homestead claims, yet, in the opinion in each, preëmption and homestead claims were mentioned and considered as standing in this respect upon the same footing. Further, it may be noticed that the granting clause of the Pacific Railroad acts, differing from similar clauses in other railroad grants, excepts lands to which preëmption or homestead "claims" have attached, instead of simply cases of preëmption or homestead "rights." And the filing of this declaratory statement was, in the strictest sense of the term, the assertion of a preëmption claim, and when filed and noted it was officially recognized as such. Indeed, if this is not so, there is no preëmption claim of record until the full right of the preëmptor is established by proofs and final entry, at which time he acquires an equitable title sufficient to support taxation, and one of which he cannot be dispossessed except by some legal proceedings. *Witherspoon* v. *Duncan*, 4 Wall. 210; *Orchard* v. *Alexander*, 157 U. S. 372.

In this respect notice may also be taken of the rule prevailing in the land department where the filing of the declaratory statement is recognized as the assertion of a preëmption claim which excepts a tract from the scope of a railroad grant like this. See among other cases *Malone* v. *Railway Company,* 7 Land Dec. 13; *Millican* v. *Railroad Company,* 7 Land Dec. 85; *Payne* v. *Railroad Company,* 7 Land Dec. 405; *Railroad Company* v. *Lewis,* 8 Land Dec. 292; *Railroad Company* v. *Stovenour,* 10 Land Dec. 645.

Indeed, this declaratory statement bears substantially the same relation to a purchase under the preëmption law that the original entry in a homestead case does to the final acquisition of title. The purpose of each is to place on record an assertion of an intent to obtain title under the respective statutes. "This statement was filed with the register and receiver, and was obviously intended to enable them to reserve the tract from sale, for the time allowed the settler to perfect his entry and pay for the land." *Johnson* v. *Towsley,* 13 Wall. 72, 89. By neither the declaratory statement in a preëmption case nor the original entry in a homestead case is any vested right acquired as against the government. For each fees must be paid by the applicant, and each practically amounts to nothing more than a declaration of intention. It is true one must be verified and the other need not be, but this does not create any essential difference in the character of the proceeding; and when the declaratory statement is accepted by the local land officers and the fact noted on the land books, the effect is precisely the same as that which follows from the acceptance of the verified application in a homestead case and its entry on the land books. The latter, as we have seen in the two cases of *Railway Company* v. *Dunmeyer* and *Railroad Company* v. *Whitney, supra,* has been expressly adjudged to be sufficient to take the land out of the scope of the grant. The reasons given therefor lead to the same conclusion in respect to a declaratory statement. Counsel urges that, inasmuch as the latter need not be verified, one might file under assumed names declaratory statements on every tract within the limits of a railroad grant prior to the time of

the filing of the map of definite location, and thus prevent the railroad company from receiving any lands. This danger is more imaginary than real. In the first place, for each application fees must be paid, and it is not to be supposed that any one would throw away money for the mere sake of preventing a railroad grant from having any operation. In the second place, such declaratory statements under assumed names would be purely fictitious and could be set aside as absolutely void. Indeed, good faith is presumed to underlie all such applications. The acceptance of the declaratory statement by the local land officers is *prima facie* evidence that they have approved it as a *bona fide* application, and if, in any particular instance, it is shown to be purely fictitious, doubtless there is an adequate remedy by proper proceedings in the land office. There is in the case before us no pretence that the transaction was a fictitious one, or carried on otherwise than in perfect good faith on the part of the applicant. At any rate, Congress has seen fit not to require an affidavit to a declaratory statement, and has provided for the filing of such unsworn statement as the proper means for an assertion on record of a claim under the preëmption law, and that is all that is necessary to except the land from the scope of the grant.

With reference to the second matter, it is true that section 6 of the act of 1853 (10 Stat. 246) provides "that where unsurveyed lands are claimed by preëmption, the usual notice of such claim shall be filed within three months after the return of the plats of surveys to the land offices." But it was held in *Johnson* v. *Towsley, supra*, that a failure to file within the prescribed time did not vitiate the proceeding, neither could the delay be taken advantage of by one who had acquired no rights prior to the filing. As said in the opinion in that case (p. 90) : "If no other party has made a settlement or has given notice of such intention, then no one has been injured by the delay beyond three months, and if at any time after the three months, while the party is still in possession, he makes his declaration, and this is done before any one else has initiated a right of preëmption by settle-

ment or declaration, we can see no purpose in forbidding him to make his declaration or in making it void when made. And we think that Congress intended to provide for the protection of the first settler by giving him three months to make his declaration, and for all other settlers by saying if this is not done within three months any one else who has settled on it within that time, or at any time before the first settler makes his declaration, shall have the better right." See also *Lansdale* v. *Daniels*, 100 U. S. 113, 117, where it is said: "Such a notice, if given before the time allowed by law, is a nullity; but the rule is otherwise where it is filed subsequent to the period prescribed by the amendatory act, as in the latter event it is held to be operative and sufficient unless some other person had previously commenced a settlement and given the required notice of claim." The delay in filing, therefore, had no effect upon the validity of the declaratory statement.

With reference to the third contention, it is true that section 6 of the act of 1853, heretofore referred to, provides not merely when the declaratory statement shall be filed, but also that "proof and payment shall be made prior to the day appointed by the President's proclamation for the commencement of the sale, including such lands." But the President's proclamation, appointing February 14, 1859, as the day for commencing the sale of public lands in certain townships, in one of which was the land in question, expressly excepted and excluded mineral lands therefrom, and on that ground this land was not offered.

It was said by Mr. Secretary Noble, in his decision on the appeal of the railway company (11 Land Dec. 195, 196):

"While it is true that the proclamation included said township 12 N., of range 7 E., it also declared that no 'mineral lands,' or tracts containing mineral deposits, are to be offered at the public sales, such mineral lands being hereby expressly excepted and excluded from sale or other disposal, pursuant to the requirements of the act of Congress approved March 3, 1853.

"Pursuant to this direction the local officers withheld from

offering and sale all of said section 33, as appears by their report dated March 18, 1859. After stating all the offerings and sales made in said township and range, the report concludes: 'All the balance of the township reserved, mineral lands.' All of section 33 was so reserved.

"It thus appears that the tract in question remained in the category of unoffered lands, and was not proclaimed for sale. The preëmption act of March 3, 1843, (5 Stat. 620,) provided that the settler on unoffered land might make proof and payment at any time before the commencement of the public sale, which should embrace his land. Until such time arrived the filing protected the claim of the settler. This was the status of the law at the time said company's rights attached, and it so continued until modified by the act of July 14, 1870. 16 Stat. 279."

We see no sufficient reasons for doubting the conclusions thus reached by the Secretary.

These are all the questions presented by counsel. There was no error in the ruling of the Circuit Court, and its judgment is, therefore,

*Affirmed.*