## SOUTHERN PAC. R. CO. v. BROWN.

### SAME v. BRAY.

(Circuit Court of Appeals, Ninth Circuit. June 19, 1896.)

### Nos. 258, 259.

PUBLIC LANDS—GRANT TO RAILROAD COMPANY—LAND SUB JUDICE.

The facts that a tract of land is claimed as part of a Mexican grant confirmed by the United States, and that a survey under the authority of the government has included the tract within the limits thereof, exclude such tract from the category of public land, and so from the operation of a grant by congress to a railroad company, although it is ultimately decided, in a proceeding pending at the time of the congressional grant, that the land in question is not within the limits of the Mexican grant.

Appeal from the Circuit Court of the United States for the Southern District of California.

These were suits brought by the Southern Pacific Railroad Company against David R. Brown and Nathaniel Bray, respectively, to establish a claim to certain lands. The circuit court dismissed the bills. 68 Fed. 333. Complainant appealed. Affirmed.

Wm. Singer and W. F. Herrin, for appellant.

Joseph H. Call, for appellees.

Before McKENNA and GILBERT, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. These suits were respectively brought to obtain decrees that the appellees therein held whatever title was conveyed to them by certain patents in trust for the appellant. The real question for decision is whether the lands patented to appellees passed by, or were excluded from, the grant made by congress to appellant under the provisions of the "Act to incorporate the Texas Pacific Railroad Company, and to aid in the construction of its road and for other purposes," approved March 3, 1871. 16 Stat. 573. In order to save costs of printing a record on appeal in each of these cases, it was stipulated by the respective counsel "that the lands involved in said case against Brown, and in the said case against Bray, are in the same situation and condition as respects the claimed limits of the Jurupa rancho and Juapa rancho, and preliminary surveys of said ranchos, and that both of said causes may be heard * * * upon a single transcript and printed record, which shall contain the pleadings in both causes, and the reports of examiners and testimony taken in said case No. 258, against Brown." The lands in question are situated in the E. ½ of section 33, township 2 S., range 7 W., S. B. M., and are part of an odd section within the 20-mile limits of appellant's railroad; and if they were "public lands" at the time the grant of March 3, 1871, took effect, they passed to appellant by virtue of that grant. The contention of the appellees is that the land in controversy, at the time of the passage of the act of March 3, 1871, was claimed to be within the limits and boundaries of the rancho Jurupa, and occupied as such, and was therefore "sub judice," within the meaning of that term as applied to railroad grants.

The Mexican grant, Jurupa, was made by Gov. Juan B. Alvarado to Juan Bandini on the 28th of September, 1838, and juridical possession thereof was given to Bandini December 4, 1838. In September, 1852, Bandini petitioned the United States commissioners for the adjudication and settlement of California land claims for a confirmation of his Jurupa grant, and on October 17, 1854, the commissioners filed their decree confirming the grant; and thereafter the grant was finally confirmed by the United States district court on April 5, 1861, to Abel Stearns, who had been substituted for Bandini as claimant. The grant was for lands known as "Jurupa," situate in the county of San Bernardino,

to the extent of 11 square leagues, within the boundaries designated in the juridical possession given of said lands to Juan Bandini. The boundaries of this land, as stated in the decree of the district court, are as follows:

"Commencing at the foot of a small hill, standing alone, at the cañada which the Messrs. Yorba recognize as their boundary, on the further side of the river Jurupa, which hill the Indians, in their tongue, call 'Pachappa,' which was taken for a landmark, placing on it certain stones on top of others; thence course westerly along the bank of said river thirty thousand varas to the point of the same table-land on which Mr. Bandini had established his house, and where the said river makes a bend, where a stake was driven for a landmark; thence northerly. fronting towards Cucamonga, seven thousand varas, passing between the two springs of Guapan, ending at the first white sand bank which there is on said course towards Cucamonga; thence easterly the same thirty thousand varas to a small, lone mountain on the left hand of the high road going from San Gabriel to San Bernardino, called by the Indians 'Catamalcay,' and which was designated as a landmark; thence southerly seven thousand varas to the point of beginning at the foot of the small hill called 'Pachappa,' which makes a corner, east, west."

In order to more clearly show the location of the western boundary, it becomes necessary to refer to the rancho El Rincon, which was granted by the Mexican government to Juan Bandini April 8, 1839, and was confirmed by the United States board of land commissioners, February 13, 1855, to Bernardo Yorba. The description of this land, and the boundaries thereof, are described in the decree as follows:

"The land of which confirmation is made is situated in the county of Los Angeles, and is known by the name of 'El Rincon,' being the same which was granted to Juan Bandini by Governor Alvarado on the 28th of April, 1839, and now held and occupied by present claimant, and is bounded as follows: On the east by the rancho Jurupa, on the south by the Rio Santa Anna, on the west by the rancho of San Antonio,—and extending northerly from the river one league, containing one square league of land."

An appeal from the decree of the district court in the Jurupa Case was taken to the United States supreme court, and this appeal was there dismissed. Pending that appeal, in June and July, 1869, a survey of this grant was made, under the instructions of the United States surveyor general, by Deputy United States Surveyor Reynolds, and this survey included the lands here in controversy as a part of the rancho Jurupa. This survey was made under and by virtue of the provisions of the act of congress of July 2, 1864 (13 Stat. 356), which directed the surveyor general, in surveying claims of this character, to follow as closely as practicable the decree of confirmation, when such decree designated the specific boundaries of the grant. The survey, as made by Reynolds, was approved by the United States surveyor general for California February 26, 1872, but was rejected by the commissioner of the general land office May 13, 1876, and his rejection was approved by the secretary of the interior February 21, 1877, and a new survey of the grant was ordered to be made. This new survey was made in November, 1878, by one William Minto, which was approved by the department of the interior, and a patent was issued by the government May 23, 1879. The lands in controversy were not included in the Jurupa grant, as surveyed by Minto

and patented by the government. Appellee Brown settled upon the land claimed by him in 1878, and has ever since continued to reside upon and occupy it. Appellee Bray entered into possession of his land, and has ever since continued to reside upon and occupy the same. The respective lands were patented to them on May 23, 1879, the same then being free public lands.

The contention of appellant is that the El Rincon was a grant of quantity, finally adjusted in 1860 to the boundaries as patented; that no one ever claimed the boundary of the Jurupa to extend further west than the west line as surveyed by Reynolds; that no order was ever made by the commissioner of the general land office, or any officer of the government, withdrawing the land in controversy, pending the adjustment of either the Jurupa or Rincon claim; that the act of July 1, 1864 (13 Stat. 332), under the provisions of which the Reynolds survey was made, did not authorize the surveyor general to approve surveys of Mexican grants, but vested this duty in the commissioner of the general land office; that the surveyor general, in his instructions to Deputy Reynolds, required the survey to be made according to the provisions of section 7 of the act of 1864, but erroneously described the western boundary line of the Jurupa as passing between the two springs of Gaspar, instead of as passing between the two springs of Guapan; that there is no testimony in the record to show that the springs of "Gaspar" or "Caspar" are identical with "Guapan" or "Guapas"; that the true boundaries of the Jurupa, as described in the decree, never did embrace the lands in controversy; and that there is no testimony in the record that any owner in the Jurupa ever claimed this land to be within its limits.

It will not be necessary to follow the argument of counsel upon all the points raised by this contention, based as it is upon the ground that the grant of the Jurupa, as made by the Mexican government, did not in fact embrace the land now claimed by appellees, Brown and Bray. The question is not whether the lands were embraced in the Jurupa grant at the time the grant was made to the railroad company, but whether they were at that time claimed to be within its boundaries. The results, as "finally confirmed," show clearly that as a matter of fact the lands were never within the true boundaries of the Jurupa grant. It is immaterial whether the grant to Rincon was a grant of quantity or not. That grant was evidently introduced, out of abundant caution, to show that the east line of the Rincon coincided with the west line of the Jurupa, and that, inasmuch as the lands in controversy lie between those grants, it must have been claimed as lying within the limits of one or the other. Be that as it may, all the testimony, uncontradicted, shows that the lands were included in the survey of Reynolds as part of the Jurupa. We are unable to perceive how the confusion as to the name of the springs can be made essential in deciding the legal question involved in the case. In the decree of the court the west boundary of the Jurupa extends "between the two springs of Guapan." But in the copy of this decree, as certified by the surveyor general, it is "between the two springs of Gaspar (or Caspar)"; the confusion in names being with the clerk who copied the record, in being unable to determine how it was spelled. One

thing is made certain: that the Reynolds survey gave the name "Gaspar" or "Caspar" to the springs, if they were not known by that name before, and that the springs were situated west of the lands in controversy,—one spring being near to or on the land of appellee Bray, and the other upon the land of one Daniel Cline, which is west of the lands of the appellees; and this fact shows, beyond all dispute, that the lands of appellees were then within the claimed limits of the Jurupa rancho, and were occupied by the claimants of that grant when the act of March 3, 1871, was passed.

The question as to whether the owners of the Jurupa ever claimed this land to be within its limits is so vigorously denied by appellant's counsel that we deem it to be our duty, in corroboration of the facts found by the circuit court, to refer to the record of at least one witness, whose testimony is corroborated by others, and denied by no one. W. A. Hobbs testified that he had known the Brown and Bray places ever since 1868: that the springs known as Caspar were one south of the Brown place, and the other on Cline's ranch; that the west line of the Jurupa ran between those two springs; that the Brown and Bray places were within the limits of the Jurupa, as surveyed by Reynolds, and reputed to be within the Jurupa for a number of years after 1868, and after, 1871.

"Q. Did you know Abel Stearns in his lifetime? A. Yes, sir; very well. Q. Do you know of his exercising any acts of ownership over the land embraced in either the Brown or Bray tracts? A. He claimed up to the Rincon line. * * * Q. Would that embrace the Brown and Bray pieces? A. Yes, sir. Q. Did any particular circumstance happen * * * by which you recollect the assertion of any claim of possession on his part, or ownership, of the Brown and Bray tracts? * * * A. Yes, sir; I saw Mr. Stearns, and spoke to him about getting some range there, and he told me that I could have it * * * on the Jurupa, anywhere down to the line of the Rincon. Q. Did that embrace the Brown and Bray pieces? A. Yes, sir. Q. When was that? A. That was in '69. * * * I proposed renting from him, and he said I could have it."

He further testified that Stearns always claimed up to the Rincon line, and rented land to Mayhew and others, who kept their stock on the Brown and Bray places.

If the law required the approval of the Reynolds survey to be made by the commissioner of the general land office, instead of by the United States surveyor general, as claimed by counsel, it would not benefit appellant. The survey was made by authority of law, and it included the lands in controversy, and had not been rejected; and the owner of the Jurupa claimed the land, as surveyed, to be within his grant. It is, of course, true that, as finally surveyed and patented by the government, the two ranchos, Jurupa and El Rincon, did not join, and that it was finally determined, after the survey of Minto, by the land department of the government, that there was some public land lying between those two grants. But that fact does not inure to the benefit of appellant, because the determination of the land department did not become final until many years after the grant was made to the railroad company. The contest over the surveys of the Jurupa grant, as shown by the records in the land department, was in relation to the specific boundaries of the grant, and the fact that the owner

or owners thereof claimed that the lands here in controversy were included within said boundaries makes it manifest that until a final decision of that question the lands could not be considered as public lands. It would not, and could not, in fact, be known whether the lands were public or private until finally decided by the land department of the government. When the grant to the railroad took effect, the lands were claimed by the owner of the Jurupa to be within the boundaries of his rancho. Not only that, but a survey had been made under the authority of the government which included the land within the limits of the Jurupa. These facts excluded the land from the grant made to the railroad company, and it is not permitted to maintain its suit upon the ground that it was finally determined that the contention of the claimants to the Jurupa was not well founded; for, as before stated, it is not the validity of such claim, but the fact that it was made, that excluded the lands in controversy from the category of public lands, within the meaning of that term as used in all the railroad land grants. This general and controlling principle has been so frequently decided by this court and by the supreme court of the United States that a bare statement of the facts is sufficient to show that the lands were sub judice, and did not pass to appellant by reason of any of the provisions of the act of March 3, 1871. Amacker v. Railroad Co., 7 C. C. A. 518, 58 Fed. 851; Railroad Co. v. Maclay, 9 C. C. A. 609, 61 Fed. 554; Newhall v. Sanger, 92 U. S. 761; Railway Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. 566; Doolan v. Carr, 125 U. S. 618, 632, 8 Sup. Ct. 1228; Railroad Co. v. Whitney, 132 U. S. 357, 10 Sup. Ct. 112; Land Co. v. Griffey, 143 U. S. 32, 41, 12 Sup. Ct. 362; Bardon v. Railroad Co., 145 U. S. 535, 12 Sup. Ct. 856; Whitney v. Taylor, 158 U. S. 85, 15 Sup. Ct. 796. In Newhall v. Sanger the court, after referring to the act of March 3, 1851, creating a commission to act upon Mexican land grants, said:

"It was to be expected that unfounded and fraudulent claims would be presented for confirmation. There was, in the opinion of congress, no mode of separating them from those which were valid without investigation by a competent tribunal; and our legislation was so shaped that no title could be initiated, under the laws of the United States, to lands covered by a Spanish or Mexican claim, until it was barred by lapse of time or rejected."

In Doolan v. Carr the court said:

"Those Mexican claims were often described, or attempted to be described, by specific boundaries. They were often claims for a definite quantity of land within much larger outboundaries, and they were frequently described by the name of a place or rancho. To the extent of the claim when the grant was for land with specific boundaries, or known by a particular name, and to the extent of the quantity claimed within outboundaries containing a greater area, they are excluded from the grant to the railroad company. Indeed, this exclusion did not depend upon the validity of the claim asserted, or its final establishment, but upon the fact that there existed a claim of a right under a grant by the Mexican government, which was yet undetermined, and to which, therefore, the phrase 'public lands' could not attach, and which the statute did not include, although it might be found within the limits prescribed on each side of the road when located."

The judgment of the circuit court in both cases is hereby affirmed, with costs.