SOUTHERN PAC. R. CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. October 17, 1904.)

No. 1,045.

1. PUBLIC LANDS—RAILROAD GRANT—LANDS WITHIN SURVEY OF MEXICAN GRANT.

Where, at the time of the attaching of a railroad grant of lands in California, certain lands within the place limits of the grant were within the boundaries of a Mexican grant as previously surveyed on petition of the claimant, pursuant to Act July 1, 1864, c. 194, 13 Stat. 332, such survey, the plat and field notes of which were of record in the General Land Office, had the effect of withdrawing all lands included therein from the operation of the railroad grant, although, upon a resurvey subsequently ordered by the Land Department, some of such lands were excluded.

2. SAME—MEXICAN GRANT—FINALITY OF DECREE OF CONFIRMATION.

The finality of a decree of a District Court confirming a Mexican grant of lands in California was not affected by a mere application for an appeal, where the appeal was never perfected, but was docketed and dismissed by the Supreme Court for that reason on application of the claimant.

3. SAME—EFFECT OF SURVEY AS WITHDRAWAL OF LANDS FROM OPERATION OF RAILROAD GRANT.

Where a Mexican land grant in California, after its confirmation, was surveyed pursuant to Act July 1, 1864, c. 194, 13 Stat. 332, and a copy of the survey, after its approval by the Surveyor General of the state, was filed with the Commissioner of the General Land Office as required by such act, the fact that it had not been approved by the Commissioner did not change its effect as a withdrawal of the land embraced therein from the operation of a railroad grant which attached while it so remained on file, nor did the fact that it was subsequently disapproved and a new survey ordered.

4. SAME—RAILROAD GRANT—BONA FIDE PURCHASERS.

Under the mortgages made by the Southern Pacific Railroad Company in 1875 and 1893 to trustees for bondholders, covering the sections of land "granted by said acts of Congress," without specific description, the trustees took only such lands as were included in the grant, and did not become thereby bona fide purchasers of any particular tract not then patented and not actually included therein.

5. SAME—STATUTE REQUIRING PAYMENT FOR LANDS ERRONEOUSLY PATENTED AND SOLD.

The provisions of Act March 2, 1896, c. 39, 29 Stat. 42 [U. S. Comp. St. 1901, p. 1603], confirming the title of bona fide purchasers of lands from a railroad company to which they were erroneously patented, and also requiring the company to pay the government price for lands so patented and sold, are within the power of Congress and valid, and it is no defense to an action to recover such price that some of the lands involved were sold by the company for less than the government price, where it received a larger average price for the lands, taken as a whole.

6. EQUITY—OBJECTIONS TO JURISDICTION—WAIVER.

Where a bill presents a case in which it is competent for a court of equity to grant the relief sought, and it has jurisdiction of the subject-matter, an objection to the jurisdiction on the ground that there is an adequate remedy at law must be taken by plea, demurrer, or answer, and is waived by answering to the merits.

7. PUBLIC LANDS—RAILROAD GRANT—RECOVERY FOR LANDS ERRONEOUSLY PATENTED AND SOLD.

Under a grant to a railroad company of specific lands lying within certain place limits, with the right upon condition to select indemnity

lands in lieu thereof, it is no defense to a suit by the United States under Act March 2, 1896, c. 39, 29 Stat. 42 [U. S. Comp. St. 1901, p. 1603], to recover the government price of lands not in fact within the grant, but which were erroneously patented thereunder and have been sold to bona fide purchasers, that the company has not yet received the full quantity of land to which it is entitled, where there are sufficient other lands within its indemnity limits from which it may select to make up the deficiency.

Appeal from the Circuit Court of the United States for the Southern District of California.

For opinion below, see 123 Fed. 1007.

Wm. Singer, Jr., and Wm. F. Herrin, for appellants.

Joseph H. Call, Sp. U. S. Atty.

Before GILBERT and MORROW, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge. On February 28, 1901, the United States filed its bill in equity against the Southern Pacific Railroad Company and other defendants to quiet its title to certain lands in California, and to cancel and annul patents to other lands alleged to have been erroneously issued by the United States to the railroad company as a part of its grant of March 3, 1871, except such lands as had been sold by the railroad company to bona fide purchasers, and to obtain adjudication concerning the question of what lands had been sold to such bona fide purchasers, as to which it prayed that the title of purchasers might be confirmed, and that judgment might be had in favor of the United States against the railroad company for the sum of $1.25 per acre. Testimony was taken upon the issues raised upon the bill and the answers of the several defendants, and on the merits a decree was entered by the Circuit Court in favor of the United States, quieting its title to lands not patented, vacating patents for lands patented to the railroad company and not sold, confirming the titles of bona fide purchasers of patented lands, and adjudging that the railroad company pay the government price for the lands found to have been sold to bona fide purchasers. The railroad company and the trustees of certain trust deeds executed by it have appealed to this court.

On September 28, 1838, the Mexican government executed to John Bandini a grant for a tract of land known as the "Rancho Jurupa," and on December 4, 1838, gave him juridical possession thereof. The grant was described as follows:

"Commencing at the foot of a small hill standing alone at the canada which the Messrs. Yorba recognize as their boundary; on the further side of the river Jurupa, which hill the Indians, in their tongue, call 'Pachappa,' which was taken for a landmark, placing on it certain stones on top of others; thence course westerly along the bank of said river thirty thousand varas to the point of the same table-land on which Mr. Bandini had established his house, and where the said river makes a bend, where a stake was driven for a landmark; thence northerly, fronting towards Cucamonga, seven thousand varas, passing between the two springs of Guapan, ending at the first white sand bank which there is on said course towards Cucamonga; thence easterly the same thirty thousand varas, to a small lone mountain on the left hand of the high road going from San Gabriel to San Bernardino, called by the In-

dians 'Catamalcay,' and which was designated as a landmark; thence southerly seven thousand varas to the point of beginning at the foot of the small hill called 'Pachappa,' which makes a corner, east, west."

In December, 1852, Bandini filed his petition and claim for said land with the Board of Land Commissioners, appointed and constituted pursuant to the act of Congress of March 3, 1851, c. 41, 9 Stat. 631, entitled "An act to ascertain and settle the private land claims in the state of California." On October 17, 1854, the said Commissioners confirmed the grant of said Bandini in accordance with the description thereof contained in his petition and grant. On an appeal taken to the District Court of the United States for the Southern District of California, Abel Stearns having been substituted for Bandini as his successor in interest, the decree of confirmation was, on April 5, 1861, affirmed by that court. On January 14, 1869, Abel Stearns having filed in the office of the United States Surveyor General at San Francisco a certified copy of the decree of the court, and having applied for a survey and location of his claim, the Surveyor General found that the claim of Abel Stearns to the Jurupa rancho had been finally confirmed by the court, and directed that a survey thereof be made in accordance with the provisions of the act of Congress of July 1, 1864, c. 194, 13 Stat. 332. The survey was accordingly made in the year 1869, and on February 26, 1872, the plat and field notes thereof were filed with and approved by the Surveyor General for the District of California, and were filed in the office of the Commissioner of the General Land Office. They were entitled, "Field notes of survey of Rancho Jurupa finally confirmed to Abel Stearns." On February 26, 1877, the Secretary of the Interior ordered that a resurvey be made of the Jurupa rancho, and in the following year such resurvey was made; and upon such second survey, and in accordance therewith, a patent was issued on May 23, 1879, to Abel Stearns, and was accepted by him. By the second survey and the patent which was issued thereupon, the west line of the Jurupa rancho was changed, and the northern boundary line thereof was readjusted and established at a considerable distance south of the northern line as located by the first survey. The lands in controversy in this suit lie between the northern lines of the two surveys. They are included in the first survey of the Jurupa rancho, but are excluded from the second. They are also within the place limits of the railroad grant given in aid of the construction of the Southern Pacific Railroad from a point near Tehachapi Pass, via Los Angeles, to the Colorado river at or near Ft. Yuma. In the year 1874 the railroad company filed with the Commissioner of the General Land Office its map of definite location, and constructed its road in accordance therewith. The grant to the railroad company and the definite location of its lines were made in the interim between the first and the second surveys of the Jurupa rancho. The principal question involved in this case is whether or not the lands in controversy were subject to the railroad grant.

In Southern Pacific Railroad Company v. Brown, 75 Fed. 85, 21 C. C. A. 236 the controversy concerned lands affected by the

change in the western boundary line of the Rancho Jurupa as made by the second survey and the patent. This court held that the land was sub judice at the date of the railroad grant and at the time of the location of the line of the road, for the reason that it was at those dates included in the first survey of the Jurupa grant. In so holding, the court found and gave effect to parol evidence that Stearns in his lifetime had claimed the land to be within the boundaries of his grant. The appellants seek to distinguish the present case from that, and to present considerations not involved in that decision. They contend that none of the lands in suit were sub judice at the time when the railroad land grant attached, for the reasons: First, that it nowhere appears in the record that either Bandini or Stearns, his successor in interest, ever claimed that the lines established by the first survey were the true lines of the Jurupa grant; second, that at the time of that survey there had been no decree finally confirming the grant, for the reason that an appeal had been taken to, and was pending in, the Supreme Court of the United States, and that until the decree was finally confirmed the Surveyor General had no lawful authority to make such survey under the provisions of the act of July 1, 1864, c. 194, 13 Stat. 332; third, that the first survey and the map thereof were never approved by the Commissioner of the General Land Office as required by the law of 1864, and that the approval thereof by the Surveyor General was without legal significance.

It is true that the record furnishes no information whatever that a claim was ever actually asserted by either Bandini or by Stearns that the lines of the Jurupa grant were the lines established by the first survey. The appellants contend that the lines established by that survey included more than the land described in Bandini's petition to the Board of Commissioners. There is nothing in the record to substantiate that contention. It cannot be discovered by reading the averments of the petition and comparing them with the lines fixed by the first survey that there is variance between them. The whole difference in the surveys, it appears, was caused by different identification by the surveyors of the landmarks and lines described in the grant. The act of 1864, under which the first survey was made, authorized such a survey, and declared it to be the duty of the Surveyor General of California "to cause all the private land claims finally confirmed to be accurately surveyed and plats thereof to be made whenever requested by the claimants." In the Brown Case the court answered the contention that Stearns never made actual claim to the land in controversy by referring to the evidence, which proved the contrary. But it is not conceived that that consideration controlled the decision in that case. In order to withdraw the land from the operation of the railroad grant, it was not necessary that Stearns should have expressly claimed in accordance with the first survey. It was sufficient that he never of record repudiated it or denied its correctness. He had made his claim by describing his grant in his petition and seeking its confirmation. The survey which was made in pursuance thereof was the official interpretation of his claim. Until it was dis-

approved it stood upon the files and records of the General Land Office as the assertion of his claim and the basis of his application for a patent. Standing as it did upon the records, it had the effect to withdraw the land therein described from the operation of the railroad land grant. Newhall v. Sanger, 92 U. S. 761, 23 L. Ed. 769; Doolan v. Carr, 125 U. S. 618, 8 Sup. Ct. 1228, 31 L. Ed. 844; Cameron v. United States, 148 U. S. 301, 13 Sup. Ct. 595, 37 L. Ed. 459; Hastings & Dakota Railroad v. Whitney, 132 U. S. 357, 10 Sup. Ct. 112, 33 L. Ed. 363; and Whitney v. Taylor, 158 U. S. 85, 15 Sup. Ct. 796, 39 L. Ed. 906. In Hastings & Dakota Railroad Co. v. Whitney it appeared that, at the time of the filing by the railroad company of its map of definite location, there stood upon the records of the local land office a defective homestead entry. The court said of the homestead entry:

"So long as it remains a subsisting entry of record, whose legality has been passed upon by the land authorities, and their action remains unreversed, it is such an appropriation of the tract as segregates it from the public domain, and therefore precludes it from subsequent grants."

In Whitney v. Taylor it appeared that a pre-emption entry remained uncanceled upon the records of the land office at the time of the railroad land grant, but that the pre-emption entryman had abandoned his claim and had left the country three years before the date of the grant. The court held that the entry, being of record at the time when the grant to the railroad company attached, had the effect to except the land from the operation thereof, and that after the subsequent cancellation of the entry the land remained part of the public domain.

It is urged that at the time of the first survey the Jurupa claim had not been finally confirmed, for the reason that an appeal had been taken to the Supreme Court of the United States from the decree of the District Court of the Southern District of California affirming the decision of the board of Commissioners. The evidence upon that point consists of a single document, a transcript of a mandate of the Supreme Court of the United States issued on January 8, 1875, directed to the District Court of the United States for the District of California, reciting that—

"The United States had prayed an appeal to the Supreme Court from the decree of the District Court, as by the inspection of the certificate of the clerk of the said District Court under the seal of the said court, which was brought into the Supreme Court of the United States agreeable to the act of Congress and the rules of said Supreme Court in such case made and provided, fully and at large appears. And whereas, in the present term of October, in the year of our Lord one thousand eight hundred and seventy-four, the said cause came on to be heard before the said Supreme Court, and it appearing that the said appellant has failed to have its cause filed and docketed in conformity to the rules of this court, it is now hereby ordered, adjudged, and decreed by this court that this appeal from the District Court of the United States for the District of California be, and the same is hereby, docketed and dismissed."

From this mandate it would appear that the only step taken by the United States toward taking an appeal to the Supreme Court from the decree of the District Court was to pray for the allowance of an appeal, and that the order of dismissal was obtained by

the claimant in that suit by producing and filing in the Supreme Court a certificate of the clerk of the District Court showing that fact. Such an application for an appeal could have no effect upon the finality of the decree of the District Court. In Hubbell v. The United States, 171 U. S. 203–210, 18 Sup. Ct. 828, 43 L. Ed. 136, the court in a similar case said:

"It appears that on August 21, 1885, an application for an appeal was filed by the claimant; but as this appeal was never allowed or perfected, and as it does not appear that a transcript of the record was ever filed in this court, it is obvious that the authorities which hold that an appeal perfected to a superior court vacates the judgment of the court below have no application to this case."

At the time when the application was made for the survey, the decree of the District Court had stood eight years upon the records of the court unaffected by any subsequent proceeding except an application for an appeal—an appeal that, so far as the record shows, was never perfected. There can be no doubt that it was a final confirmation of the claim at the time when the first survey was made.

The fact that the first survey was not approved by the Commissioner of the General Land Office did not impair its effect as an official withdrawal of the lands from the railroad grant. The act of July 1, 1864, c. 194, 13 Stat. 332, provides that if no objection shall be made to the survey the Surveyor General of the state of California shall approve the same and transmit a copy thereof to the Commissioner of the General Land Office at Washington for his examination and approval. The survey and plat in this case remained awaiting approval until 1876, when it was disapproved by the Commissioner. A similar state of facts existed in Doolan v. Carr, supra, in which it appeared that in 1865 an official survey of a Mexican grant was made under the directions of the Surveyor General, and in the following year was duly approved by him, and that it was never approved by the Commissioner of the General Land Office, but that in 1868 it was set aside, and that in March, 1869, a new survey was made. The court held that the land claimed as a part and parcel of said Mexican grant was reserved as such continually from the date of that grant in 1839 until June 6, 1871, the date when the second survey was approved by the Commissioner of the General Land Office. It was not necessary, therefore, that, in order to withdraw the land from operation of the railroad land grant, there should have been an approval of the survey by the Commissioner of the General Land Office. The claim as surveyed was of record, pending and awaiting such approval. If the approval had been made, the patent would have issued in accordance therewith under the directions of the act of 1864. That it was not so approved, rendered it none the less a withdrawal. Tubbs v. Wilhoit, 138 U. S. 134, 11 Sup. Ct. 279, 34 L. Ed. 887.

It is contended that the act of March 2, 1896, c. 39, 29 Stat. 42 [U. S. Comp. St. 1901, p. 1603], gratuitously and unconditionally confirmed title to the lands which had been mortgaged by the railroad company, and that the Circuit Court erred in setting aside the

patents to these lands. The act so referred to provided that "no patent to any land held to a bona fide purchaser shall be vacated or annulled, but the right and title of such purchaser is hereby confirmed." Allusion is made to the fact that the act differs materially from the act of March 3, 1887, c. 376, 24 Stat. 556, which contained the proviso that a mortgage or pledge "of said lands by the company shall not be considered as a sale for the purpose of this act," and it is argued that, by the act of 1896, Congress intended to affirm the title of all the lands mortgaged in good faith by the railroad company. As sustaining this view, reference is made to the language of the decision in United States v. Winona, etc., 165 U. S. 481, 17 Sup. Ct. 373, 41 L. Ed. 789, in which it was said:

"The act of 1896, confirming the right and title of a bona fide purchaser, and providing that the patent to his land should not be vacated or annulled, must be held to include one who, if not in the fullest sense a bona fide purchaser, has nevertheless purchased in good faith from the railroad company."

To this it is a sufficient answer to say that the mortgages in the present case do not by their terms include any of the lands which are involved in the controversy. The first mortgage was made in 1875, and the second in 1893. The lands were not patented to the railroad company until 1894. In neither of the mortgages are the mortgaged lands particularly described. The conveyance is of the sections of land "granted by said acts of Congress." Under such a mortgage the trustees took, for the benefit of the bondholders, such lands only as were included in the grant. They were not, and could not be, bona fide purchasers of any particular tract of land not actually included therein. These particular lands were not specially described in or understood to be included in the mortgage, nor were they, so far as the record shows, within the common intent of the contracting parties.

It is contended, further, that the appellee is not entitled to recover any price for the lands sold by the appellants, because, first, by the act of March 2, 1896, Congress gratuitously and unconditionally affirmed the title thereto; second, the demand for such payment is in assumpsit at law; and, third, the railroad company has not received, these lands included, the quantity of land granted it by Congress. It is said that, with full power to cancel the patents and thus recover the lands, Congress chose to affirm the title to purchasers in good faith, which it is conceded it had the power to do; but, it is urged that after such confirmation it had no power to place upon all of said lands the price of $1.25 per acre, and to declare that the railroad company shall, because of such confirmation, be a debtor to the United States, and reference is made to the fact that some of the lands were sold by the railroad company at less than $1.25 per acre. Congress, no doubt, had the right to confirm the title to the purchasers who bought in good faith from the railroad company lands which were erroneously patented to it, and it did so. It also had the right to require the railroad company to account, as for money had and received, for the amounts realized by it on the sale of such lands. Instead of so doing, Congress provided that the railroad company should pay the regular minimum

price at which the government had offered similar lands for sale. It is no answer to the asserted right of the government to recover this amount that some of the lands were sold for less than that price. It is not disputed that the railroad company received for all the lands so disposed of a price which would average more than $1.25 per acre. The transaction is to be dealt with as a whole, and is not to be affected by the fact that some of the tracts may have been sold for less than $1.25 per acre.

The point is made that an action to recover the value in money of lands sold cannot be joined with a suit to cancel patents for other lands, and that the case proven shows no ground of equitable jurisdiction as to the several tracts of land sold by the appellants. But there was no demurrer to the bill, or plea to the jurisdiction in equity. By answering to the merits the appellants waived any right they may have had to object to the power of the court to deal with the case as one in equity, the court having the power to grant the relief sought. Union Trust Co. v. Illinois Midland Ry. Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963; Brown v. Lake Superior Iron Co., 134 U. S. 530, 10 Sup. Ct. 604, 33 L. Ed. 1021; Insley v. United States, 150 U. S. 512, 14 Sup. Ct. 158, 37 L. Ed. 1163; Perego v. Dodge, 163 U. S. 160, 16 Sup. Ct. 971, 41 L. Ed. 113. See, also, Southern Pacific Railroad Co. v. United States (decided by this court at the present term) 133 Fed. 651.

The appellants contend that the money value of the land patented to the railroad company and sold by it to bona fide purchasers cannot properly be recovered from the company without showing that it had already received, those lands excluded, the full quantity granted it by the act; that, where lands have been erroneously patented to a railroad company under a grant of quantity, the proper remedy is to charge the quantity of land thus patented against the quantity granted in final adjustment; and that, since the government price of all such lands is the same, the appellee will sustain no loss or injury if recovery of the price of these lands is denied. The case of United States v. Winona, etc., R. R. Co., 165 U. S. 463, 17 Sup. Ct. 368, 41 L. Ed. 789, is cited in support of this contention. The suit in that case was brought by the United States for the purpose of canceling certifications of certain lands that had been wrongfully certified to the state of Minnesota for the benefit of the railroad. The railroad company had many years before constructed its road and earned the land granted. It had received no more land than Congress had proposed to grant in aid of the construction of the road. The court, referring to these facts, and to the fact that it did not appear that there were not within the granted or indemnity limits lands which the company might have rightfully received but for the erroneous certification, said, on page 482, 165 U. S., page 373, 17 Sup. Ct., 41 L. Ed. 789:

"It will hardly be contended that if, simply through a mistake of the Land Department, these lands were certified when at the time other lands were open to certification which could rightfully have been certified, and which have since been disposed of by the government to other parties, so that there is now no way of filling the grant, the government can nevertheless recover the value of the lands so erroneously certified."

That case, it will be observed, differs materially from the present case, in the fact that in the former there remained no lands within the indemnity limits for selection by the railroad company out of which it could have secured the quantity of lands given it by the grant. In the case at bar, while it is true that the railroad company has not yet received within its place limits, including the lands in controversy in this suit, the full quantity of land granted it by Congress, there is no contention that it cannot, out of the indemnity limits, obtain full satisfaction of its grant. It is stipulated in the case that within the indemnity limits of the grant and outside of the 20-mile limits "there now remain more than 50,000 acres of surveyed public lands of the United States for which there has been no selection or application to select made by said company." That the company has not received, exclusive of the lands in controversy, the full quantity of land granted in aid of the construction of its road, is no reason why it should be allowed to retain those lands, or to deny its liability for the value thereof when sold to others. The grant was not a grant of quantity, but a grant of specific lands within certain place limits, with the right, upon conditions, to select indemnity lands in lieu thereof. In brief, the answer to the company's contention is that these lands are not within its grant; that they are lands to which it had no right; and that it must therefore pay the price fixed by the government, and look to the indemnity limits for the satisfaction of its grant.

The decree of the Circuit Court is affirmed.