# THE UNITED STATES OF AMERICA ex rel. THE RIVERSIDE OIL CO.

### *v.*

## HITCHCOCK.

---

### MANDAMUS; PUBLIC LANDS.

1. While the writ of *mandamus* will lie to control the action of executive officers of the Government, when, having exhausted their judicial discretion, they have denied, without legal cause, the just legal rights of private persons, it cannot be used to serve the purpose of an appeal or writ of error, or used to control the exercise of judicial discretion.
2. Where a patentee of public land applied for a patent for other public land, non-mineral in character, to be taken by him in lieu of the land he held, and the Secretary of the Interior, acting upon protests filed against the selection, decided that as the applicant had failed to show by proper averments in his application that the land was open for settlement, it remained open for settlement under the mining law, and that as during that time the protestants had occupied the land and discovered petroleum therein and were working the same, it was shown to be mineral and not agricultural land, and thereupon rejected the selection, it was *held,* affirming an order denying an application for the writ of *mandamus* against the Secretary to compel him to approve the selection and issue the applicant a patent, that regardless of the merits of the controversy, the respondent had acted within his jurisdiction and his action could not be controlled or reviewed by *mandamus.*

D. C.]                         Statement of the Case.

3. In such a proceeding, it is immaterial that the selector was
   required, without warrant of law, to accompany his applica-
   tion with an affidavit that the land was unoccupied and non-
   mineral in character; and it is of no consequence whether the pro-
   tests were sufficient as a basis for a formal contest between the
   parties, so long as they tended to show that the land was not
   open for settlement, having been settled on by other parties.
4. The use of the writ of *mandamus* is limited to the enforcement of
   a merely ministerial duty and to the protection of a plain ad-
   mitted and unquestioned legal right that has been arbitrarily or
   without due warrant of law denied.

No. 1264. Submitted January 22, 1903. Decided February 3, 1903.

HEARING on an appeal by the petitioner from an order of
the Supreme Court of the District of Columbia overruling a
demurrer by the petitioner to the return of the respondent,
the Secretary of the Interior, to a rule to show cause why
the writ of *mandamus* should not issue to compel the re-
spondent to approve the petitioner's selection of certain
public lands and to issue him a patent therefor, and, the
petitioner electing to stand by his demurrer, discharging the
rule and dismissing the petition.                         *Affirmed.*

The COURT in the opinion stated the case as follows:

This is an appeal from an order of the Supreme Court of
the District of Columbia, refusing the issue of a writ of
*mandamus* and dismissing a petition therefor.

The Riverside Oil Company, the petitioner for the writ,
is a body corporate under the laws of the State of Nevada,
and, as stated in the petition, is empowered to acquire and
hold land in the State of California, wherein by the present
proceedings it seeks to acquire some public land of the United
States, as the assignee of the right of one C. W. Clarke.
The purpose of its proceeding is to require the Secretary
of the Interior Department to issue a patent to it for the
lands in question.

By an act of Congress of March 3, 1891 (26 Stat. 1095),
the President of the United States was authorized " from
time to time to set apart and reserve, in any State or Ter-
ritory having public land bearing forests, in any part of the

public lands wholly or in part covered with timber or under-growth, whether of commercial value or not, as public reservations," and by public proclamation "declare the establishment of such reservations and the limits thereof. In pursuance of this act, the President, by public proclamation issued on February 14, 1893, established what is known as the "Cascade Range Forest Reservation" in the State of Oregon. Within the limits of this reservation C. W. Clarke, heretofore mentioned, had become the owner of two tracts of land, one of 40 acres and the other of 120 acres, and had received patents for them. Under an act of Congress of June 4, 1897 (30 Stat. 36), he and others similarly situated were authorized to surrender their lands to the United States, and to receive in exchange for them any other public lands of the United States which were vacant and open to settlement. The act, so far as it bears upon the present subject, is as follows:

"That in cases in which a tract covered by an unperfected *bona fide* claim or by a patent is included within the limits of a public forest reservation, the settler or owner thereof may, if he desires to do so, relinquish the tract to the Government, and may select in lieu thereof a tract of vacant land open to settlement not exceeding in area the tract covered by his claim or patent; and no charge shall be made in such cases for making the entry of record or issuing the patent to cover the tract selected; provided further, that in cases of unperfected claims the requirements of the law respecting settlement, residence, improvements, and so forth, are complied with on the new claims, credit being allowed for the time spent on the relinquished claims."

On December 14, 1899, Clarke filed in the United States Land Office at Visalia, in the State of California, two separate applications for two distinct parcels of the public land in that State to be taken by him in lieu of his lands in Oregon, within the Cascade Reservation, for which he then and there filed deeds of conveyance to the United States; and in support of each application he filed an affidavit as to the non-mineral character of the lands, and their nonoccupancy by

other persons, such as had been prescribed by the Commissioner of the general land office, but with some modifications therein made by himself. These papers were all duly transmitted to the general land office in this city.

In order to carry into effect the provisions of the act of Congress of June 4, 1897, which authorized this exchange of lands, the Commissioner of the general land office, in April, 1898, prescribed a form of application, subsequently approved by the Secretary of the Interior, to be used by selectors of land under that act, which contained certain requirements to be complied with by the applicants, some of which are challenged by the relator in this case as being beyond the authority of the Commissioner or of the Secretary of the Interior to prescribe. The main requirement was that of an affidavit showing the lands selected to be nonmineral in character and unoccupied. As the controversy in this case has turned in great measure upon this affidavit, both in the land office and in the Department of the Interior and in this court, it is proper to insert it here in full, noting in brackets certain portions of it which were crossed out and eliminated by the affiant, and underlining in italics certain additions made by him. The affidavit as filed by the relator is in the following terms:

" ———— being duly sworn according to law, deposes and says that he is over the age of 21 years, a citizen of the United States and of the State of ———— and a ———— by ————, and is well acquainted with the character of the following described land and with each and every legal subdivision thereof, to wit, ————.

" [That there is no occupation of said land adverse to the selection thereof under the act of June 4, 1897, by ————]

" That the said tract applied for is agricultural in character and contains no known deposits of coal or other minerals, and is not subject to entry under the coal or mineral land laws of the United States.

" *This affidavit is made upon the evidence found upon the surface of the ground; deponent does not undertake to express any opinion as to what may be under the ground.*

" That he has frequently passed over the same, and his personal knowledge of such land is such as to enable him to testify understandingly in regard thereto; that there is not to his knowledge within the limits thereof any vein or lode of quartz or other rock in place, bearing gold, silver, cinnabar, lead, tin, or copper, or any deposit of coal; that there is not within the limits of said land, to his knowledge, any placer, cement, gravel, or other valuable mineral deposits; [that no portion of said land is claimed for mining purposes under the local customs or rules of miners, or otherwise;] that no portion of said land is worked for mineral during any part of the year by any person or persons; that said land is essentially nonmineral land; and that the application therefor is not made for the purpose of fraudulently obtaining title to mineral land, but with the object of securing said land for agricultural purposes, *so far as deponent knows;* and that the above and foregoing statements as to the character of said land apply to each and every legal subdivision thereof; and that his postoffice address is ———."

Before making his selection, Clarke had applied to the register of the land office at Visalia for information as to vacant lands open to settlement, and was officially informed by him that the lands in question were such, according to the books and records in his office. Soon after his selection, however, and the filing of the application papers, a company known as the Kern Oil Company, on February 6, 1900, filed a protest against the selection, supported by affidavits to the effect that it and its predecessors in interest were at the time of the selection, and had continuously been, and at the time of the protest were, in the possession and occupation of the lands in question, working them under certain placer mining locations made on June 11, 1899; that the lands were valueless for agricultural purposes, but valuable for deposits of petroleum oil contained therein; and that Clarke well knew the mineral character of the land when he made his selection, and that the selection on his part was an attempt fraudulently to obtain title to mineral lands.

On February 12, 1900, one J. F. Ellwood and others filed

separate protests against Clarke's selection, alleging posses-
sion and occupancy of the land by themselves for oil min-
ing purposes, substantially to the same effect as the Kern
Oil Company.

When these protests were filed in the land office at Visalia
the contest raised by them was transferred to the general
land office in this city. Clarke moved to dismiss the pro-
tests on the ground that they were insufficient to raise a con-
test; but this motion was denied, and the Commissioner of
the general land office proceeded to consider the applica-
tion, the protests and the affidavits on both sides. Upon
consideration of them he determined " that inasmuch as
the selections had not yet been approved by the land de-
partment, and consequently the lands embraced therein had
remained open to occupancy or exploration for minerals, evi-
dence with respect to their present condition and as to whether
vacant or unoccupied, and with respect to their present char-
acter as to whether known to contain valuable mineral de-
posits or not, should be taken and received for the purpose
of determining whether or not the said selections should be
approved;" and accordingly he ordered an investigation to
be had and a hearing given to the parties.

Appeal was taken by Clarke from this decision of the
Commissioner to the Secretary of the Interior. Upon the
appeal the Secretary held that, by the failure of Clarke at
the time of making his application to show by proper aver-
ments that the lands were open to settlement and that he
was entitled to make the selection, the lands remained there-
after the property of the United States, open to exploration
for mining purposes and for entry thereon under the min-
ing laws; and that, inasmuch as, while the lands so remained
open for exploration, the protestants had gone upon the lands
and occupied them and made discovery of petroleum therein,
and were working the same, and it became known and was ac-
knowledged that the lands were valuable for minerals and
worthless for agricultural purposes, the selection made by
Clarke should be disapproved and rejected.

A motion for review of this decision was filed; and while this motion was pending and unacted upon, affidavits of the nonmineral character and nonoccupancy of the land were filed on behalf of Clarke, which were apparently sufficient, if filed in time, to comply with the requirements of the regulations of the land office, and apparently would have been accepted by the office as *prima facie* sufficient at that time. But in determining the motion for a review the Secretary held that they came too late; and he affirmed his previous decision adverse to the claims of Clarke.    This final decision was rendered on June 5, 1901.

On April 16, 1902, the relator caused the petition in this case to be filed in the Supreme Court of the District of Columbia for a *mandamus* to require the Secretary of the Interior to vacate his order rejecting Clarke's selection, to reinstate the proceedings, and to order a patent to be issued upon and in pursuance of Clarke's selection.    A rule to show cause was issued; and the Secretary made return to the rule, and answered the allegations of the relator's petition.    From the answer and the petition the facts herein stated have been taken.    The respondent in his return claimed that his action was legal; that he was vested with discretion in the premises, and that in the due exercise of such judgment and discretion he had decided that Clarke was not entitled to a patent for the land selected by him.    To this return the petitioner demurred, and thereupon the cause was heard.

The court below overruled the demurrer.    A motion for rehearing was entered, a rehearing was had, and again the demurrer was overruled.    The petitioner having elected to stand by the demurrer, the court adjudged that the rule to show cause should be discharged, the prayers of the petition denied, and the petition itself dismissed.    From the order of dismissal the present appeal has been taken.

*Mr. Shirley C. Ward, Mr. Jefferson Chandler, Mr. John M. Thurston, Mr. Madison A. Ballinger, Mr. Horace F. Clark* and *Mr. William C. Prentiss* for the appellant:

1. There is no judicial question before the Secretary of the Interior for determination. Judicial power presupposes the existence of some cause or controversy set forth in some complaint or accusation against an opposing party appealing to judicial principles and submitted for decision in some customary form of judicial procedure, and authority in the tribunal to finally determine the matter. The action of the defendant is admittedly not a final disposition of the matter, for if he pass a case to patent such action would not be binding on the United States or any one claiming under them; and his action in refusing patent is likewise subject to review by the courts. *N. P. RR. Co.* v. *Colburn,* 164 U. S. 383. The patent is but evidence of a grant and the officer who issues it acts ministerially and not judicially. If he issues a patent for land reserved from sale by law, such patent is void for want of authority. *United States* v. *Stone,* 2 Wall. 535. See also *Mullan* v. *United States,* 118 U. S. 271; *Barney* v. *Dolph,* 97 U. S. 652; *Simmons* v. *Wagner,* 101 U. S. 260, and *Dibble* v. *Land Co.,* 163 U. S. 63. Passing upon homestead proofs is not a judicial, but purely ministerial, act. *Orchard* v. *Alexander,* 157 U. S. 373. There is here no question of executive discretion. Executive discretion, with which the judiciary cannot interfere, also presupposes a matter of purely executive or political nature intrusted to the judgment of an executive officer whose action is final. " Rights under our system of law and procedure do not rest in the discretionary authority of any officer, judicial or otherwise." Per Field, J., in *Ex parte Parker,* 131 U. S. 221, 225. Administrative or ministerial action is executive power in process of execution. Executive power is spontaneous official power arising out of the law itself. For an analysis of executive and judicial functions, see Lewis on the Government of Dependencies, pp. 6–8.

There is apparent confusion touching the nature of the power exercised by the Secretary of the Interior in disposing of a given piece of public land.

The Constitution vests primary jurisdiction over the sale of public land, in Congress. Congress has made the In-

terior Department in some cases, its agent to sell its land and in other cases has granted land directly to grantees named in the grant, over the head of the Interior Department, without consulting it in any manner whatever. Congress is under no obligation to consult the Interior Department in respect of the sale of its lands under any circumstances. Congress has, however, provided by particular statutes for progressive methods depending upon the acts of individuals, for the disposition of its lands to private persons, and, in these progressive proceedings for the acquisition of public lands has seen fit to give the Secretary of the Interior supervisory power over the legal method prescribed by such specific statutes.

But there is no general system for disposing of all lands, nor is there a judicial or discretionary element necessarily involved in the sale of any piece of public land. The nature of the transaction here does not contemplate discretion. A trade does not involve what is known in law as discretion. Congress may dispose of the public land through private agencies clothed with no official power whatever. It may give private commissions for the sale of its public lands, as it does for the sale of its bonds. There is no greater judicial quality or discretion in swapping a piece of public land under the law of June 4, 1897, than there is in swapping horses at common law.

There being nothing in the nature of the transaction which is judicial or discretionary, there is nothing in the administration of the law under which the exchange is accomplished which is either judicial or discretionary.

The law says to the owner of the forest reserve land, " Relinquish it, and select vacant land open to settlement in lieu of it." The statute of January 27, 1898, says that registers and receivers shall take charge of and attend to the sale of public land. The statute of March 3, 1883, declares that receivers and registers shall make plats or diagrams showing the vacant lands in their districts, when asked so to do. All the elements, therefore, of an exchange of land under the statute of June 4, 1897, are statutory ele-

ments.   The statute of June 4, 1897, provides for the trade and fixes the kind and quantity of land to be exchanged. The statute of January 27, 1898, names the officers who shall have charge of and attend to the sale of the public lands. The statute of March 3, 1883, declares where a list of the lands offered for exchange may be had and what shall be evidence that land is vacant.   No officer of the Interior Department has discretion to change or alter or modify any of these elements or statutory conclusions.

Mere intellectual activity in transacting a given piece of business, or in swapping things, is not the exercise of judicial power, nor of discretion, in the legal sense.   In the exchange involved here no form of such power could be exercised.

It is entirely *ex parte,* administrative or ministerial, from beginning to end.   It is one of the simplest transactions known to the law, the exchange of one piece of property for another, which exchange by law is complete in all its parts at the same instant of time, and which under the law of contracts calls for guaranty of title by each vendor to the other.

Wherever the government enters into a transaction of any kind, it is governed by the *principles of law* which apply to similar transactions between individuals, for a statement of which, see Bishop on Contracts, Sec. 422.   The function of the Secretary in issuing patents for land is merely ministerial.   See *Maese* v. *Herman,* 183 U. S. 572, 581.   The defendant's duty is mandatory to direct patent to issue if no objection to the validity of the contract exists.

He has here been commanded to show cause why he does not perform that duty and has set up the defense that the patent, if issued, would be void or voidable because of noncompliance with an alleged regulation.   Is he to be both executive and judiciary?   Can he say, as the executive, that he refuses to perform a ministerial act for certain reasons and then sit as the judiciary and determine that those reasons are valid and preclude an inquiry by the courts in whom all judicial power is vested by the Constitution?

Can he set up an erroneous conception of the statute as a defense to the performance of a ministerial duty imposed upon him by the true intent and meaning of the statute? Can he, the servant of Congress, be thus permitted to thwart the intention of Congress?

2. There is no room for construction of the statute involved here, and we could safely rest upon that proposition; but in the recent cases of *American School of Magnetic Healing* v. *McAnnulty,* in the Supreme Court of the United States, October term, 1902 (187 U. S.) and *Payne* v. *U. S. ex rel. Nat. Ry. Pub. Co.,* in this court (20 App. D. C. 581), the sound doctrine that *mandamus* will lie wherever a right is denied through mistake of law on the part of a ministerial officer, has been confirmed.

In our system of government neither legislative nor judicial power can be conferred upon an executive officer. The function of the executive is to enforce the law as enacted by Congress, that is, *according to its true intent and meaning.* Only that true intent and meaning is law, and the function of determining that true intent and meaning is vested solely in the judiciary. If an executive officer misconceive a statute, whether its meaning be clear or not, and act accordingly, he is not administering the *law,* but a creation of his own brain which is *not* the *law;* and if the true intent and meaning of the statute, which is the law, require the performance of the duty which he refuses to perform under the sanction of what he mistakenly sets up as law, *mandamus* should, and will, lie.

*Mr. Morgan H. Beach,* United States Attorney for the District of Columbia, *Mr. Henry H. Glassie,* Assistant, and *Mr. John S. Chapman,* Special Assistant to the Attorney-General of the United States, for the respondent, the Secretary of the Interior.

Mr. Justice MORRIS delivered the opinion of the Court:

This controversy is in fact, although not in form, one between rival claimants of the same tract of land. The relator

claims it under a selection made in pursuance of the act of Congress of June 4, 1897.    The parties who filed protests against it claim under locations and entry made by them in pursuance of the act of Congress of February 11, 1897 (29 Stat. 526), entitled "An act to authorize the entry and patenting of lands containing petroleum and other mineral oils under the placer mining laws of the United States," and which provided:

" That any person authorized to enter lands under the mining laws of the United States may enter and obtain patent to lands containing petroleum or other mineral oils, and chiefly valuable therefor, under the provisions of the laws relating to placer mineral claims.    *Provided,* that lands containing such petroleum or other mineral oils which have heretofore been filed upon, claimed, or improved as mineral, but not yet patented, may be held and patented under the provisions of this act the same as if such filing, claim, or improvements were subsequent to the date of the passage hereof."

The location and entry made by these latter parties are alleged to have been made on June 11, 1899, which antedated the relator's selection by upward of six months; and they claim to have sunk wells and found petroleum deposits within a short time thereafter.    The action of these locators is claimed by the relator to have been fraudulent, and their assertion of right in the present case to be vague and insufficient.

But here was evidently a question for the land department of the Government to settle.    We deem it wholly unnecessary for us to follow counsel in their elaborate arguments upon the merits of it, for if the nature and character of the controversy were, as we think they were, such as are remitted by law to the arbitrament and determination of the land office, the courts of this District have no authority to review the decision, or to control it, by means of the writ of *mandamus,* whether it was right or wrong.    The writ of *mandamus,* it is well settled, cannot be used to serve the purpose of an appeal or writ of error; nor can it be used to

control the exercise of judicial discretion.    It has been used in recent cases to control the action of executive officers of the Government, when, having exhausted their judicial discretion, they have denied, without legal cause, the just legal rights of private persons.    But in our opinion no such case is presented here.

The case which is presented is this:

In his undoubted legal right under the statute Clarke selected the lands in question, in lieu of those which he had surrendered as " vacant land open to settlement," having first ascertained from the register of the local land office that they were carried on his books of record as such; and he made application for a patent for them.    In the view which we take of this case, it is probably of no consequence that the selector was required without warrant of law to accompany his application with an affidavit to the effect that the land was unoccupied and nonmineral in character, when the law required nothing of the kind from him.    *Whitney* v. *Taylor*, 158 U. S. 85.    It became the right, and probably it was the duty, of the land office to investigate the condition of the land and to ascertain whether such condition remained in fact what it purported to be on the records of the office, for these records are not conclusive either upon the relator or upon the United States.    There might be matters *in pais,* mining claims, or other claims not necessarily matters of record, and yet which might suffice to show that the land had been taken by individuals and was no longer open to settlement.    Especially did it become the right and the duty of the land office, when notice of previous entry by other parties under another and equally effective statute was given to it by the protests filed by such parties.

It is of no consequence here whether those protests were sufficient as a basis for a formal contest between the parties.    They may have been vague, irregular, fraudulent, wholly without valid foundation in law, but they were presented to the office, and they tended to show that the land in question was not " vacant land open to settlement;" for it

could not have been open to settlement if it had already been settled on under form of law by other parties.

What was said by the Supreme Court of the United States, by Mr. Justice Field, in the case of *Barden* v. *Northern Pacific Ry. Co.*, 154 U. S. 288, 326, is entirely appropriate here. There it was said:

"The law places under the supervision of the Interior Department and its subordinate officers, acting under its direction, the control of all matters affecting the disposition of public lands of the United States, and the adjustment of private claims to them under the legislation of Congress. It can hear contestants and decide upon the respective merits of their claims. It can investigate and settle the contentions of all persons with respect to such claims. It can hear evidence upon and determine the character of lands to which different parties assert a right; and when the controversy before it is fully considered and ended, it can issue to the rightful claimant the patent provided by law, specifying that the lands are of the character for which a patent is authorized. It can thus determine whether the lands called for are swamp lands, timber lands, agricultural lands, or mineral lands, and so designate them in the patent which it issues. * * * It is the established doctrine, expressed in numerous decisions of this court, that whenever Congress has provided for the disposition of any portion of the public lands of a particular character, and authorizes the officers of the land office to issue a patent for such land upon ascertainment of certain facts, that department has jurisdiction to inquire into and determine as to the existence of those facts, and in the absence of fraud, imposition, or mistake, its determination is conclusive against collateral attack."

Appropriate also is what was said by the same court in the case of *Steel* v. *Smelting Co.*, 106 U. S. 447, 450, where the jurisdiction of the land office is thus stated:

"The land department, as we have repeatedly said, was established to supervise various proceedings whereby a conveyance of the title from the United States to portions of the public domain is obtained, and to see that the requirements of different acts of Congress are fully complied with.

Necessarily, therefore, it must consider and pass upon the qualification of the applicant, the acts he has performed to secure the title, the nature of the land, and whether it is of the class which is open to sale. Its judgment upon these matters is that of a special tribunal, and is unassailable except by direct proceedings for its annulment or limitation."

Upon these authorities, it is very clear that, if there was here a contest between different claimants of the land, the land office had jurisdiction to adjudicate and determine the contest; and that, if there was no formal contest between rival claimants, yet it was still within the jurisdiction of the land office, in view of the protests that had been filed and of the proof that was taken, to determine whether the land selected by Clarke was "vacant land open to settlement." If it decided the controversy erroneously, if it made a mistake in its definition of what constituted "vacant land open to settlement," if it attached undue value to the protests, if it failed to inform itself fully in regard to all the circumstances, yet, as the case was within its jurisdiction, such considerations cannot be inquired into or reviewed in a collateral proceeding, least of all in a proceeding for the writ of *mandamus,* the use of which is limited to the enforcement of a merely ministerial duty and to the protection of a plain admitted and unquestioned legal right that has been arbitrarily or without due warrant of law denied.

We express no opinion as to the merits of this case, or as to the correctness of the decision reached in it by the Secretary of the Interior. It would be improper for us to do so in the view which we take of it. It appearing very clearly to us that it is of the class of cases remitted to the judicial discretion of the land office and Secretary of the Interior, we do not think that it is one proper for the issue of the writ of *mandamus;* and we are of opinion that the court below rightly so decided.

The order appealed from will be *affirmed with costs. And it is so ordered.*

A petition by the appellants for a writ of error to the Supreme Court of the United States was prayed February 12, and allowed February 17, 1903.