M. C. MOON, Appellant, v. SALT LAKE COUNTY, a Municipal Corporation, and THE OREGON SHORT LINE RAILROAD COMPANY, a Corportion, Respondents.

No. 1531.   (76 Pac. 222.)

1.  Taxation: Tax Sales: Description.
An assessment of land for taxation, describing it as "Pt. N. E. ¼ of Sec. 26, Township 1, North, Range 1 West Salt Lake Meridian," and "In N. W. ¼ of N. E. ¼ of Sec. 26," same township, range, etc., containing seven acres, more or less, was insufficient, since the tract purporting to be assessed might have been located in any part of the larger tract described.

2.  Same: Power of Public Officer: Burden of Proof.
The power of a public officer to sell land for nonpayment of taxes is a naked power, not coupled with an interest, and hence the holder of a tax title must show that all of the requirements of the law have been strictly complied with.[1]

3.  Same: Fees: Excessiveness: Effect.
Where, on the sale of two tracts of land in controversy for nonpayment of taxes, the officers collected $7 as fees for one, and $6.50 for the other, and they were authorized by Comp. Laws 1888, section 2030 (Sess. Laws 1892, p. 30, sec. 2030a), in force at the time the sales were made, to col-

[1] Olsen v. Bagley, 10 Utah 492, 37 Pac. 739; Hamer v. Weber County, 11 Utah 16, 37 Pac. 741; Eastman v. Gurrey, 15 Utah 410, 49 Pac. 310.

lect only $4 for each sale, allowing for a certificate like those issued, and for publication and filing, the sales were void.

4. **Same.**

Under Complied Laws 1881, section 2031, providing that when real estate is sold for taxes the collector shall issue a certificate to the purchaser reciting substantially the facts of the nonpayment of the tax, the levy, and the advertisement and sale of such real estate, the collector was not entitled to prepare a certificate of such facts, which, by reason of unnecessary repetition, etc., contained 12 folios, and charge for the same at the rate of 25 cents per folio.[2]

5. **Railroads : Public Lands : Grants : Construction.**

After the U. C. railroad had been constructed into the business portion of the city of Salt Lake, where its terminal depot had been erected, Congress, by Act Dec. 15, 1870, 16 Stat. 395, granted such road a right of way through the public lands "from a point at or near Ogden City in the territory of Utah to Salt Lake City in said territory." The grant also included land for necessary grounds for stations, work shops, depots, etc., and imposed a condition that the road should be a post route and a military road, subject to the use of the United States for postal, military, naval, and all other governmental service, and should be subject to congressional regulation. *Held,* that the words "to Salt Lake City," should not be construed as limiting the grant to the boundary of such city, but authorized the construction of the road over public lands within the city limits.

(Decided April 9, 1904.)

Appeal from the Third District Court, Salt Lake County.—*Hon. William C. Hall,* Judge.

Action to quiet title to certain real estate. From a decree in favor of defendants, plaintiff appealed.

REVERSED (as to respondent Salt Lake County).

AFFIRMED (as to respondent railroad company).

*C. S. Patterson, Esq.,* and *G. W. Moyer, Esq.,* for appellant.

---

[2] Eastman v. Gurrey, 15 Utah 410.

*P. L. Williams, Esq.*, and *Geo. H. Smith, Esq.*, for respondent railroad.

*Geo. Westervelt, Esq.*; County Attorney, and *J. J. Whittaker, Esq.*, Assistant County Attorney, for respondent county.

BARTCH, J.—This is an action to quiet the title to certain real estate situate within the limits of Salt Lake City.   The plaintiff claims title from the United States through certain *mesne* conveyances; the defendant county, through tax sales; and the defendant railroad company, to a portion of the land by virtue of a grant from the United States government.   The tax title was set out in the answer of the defendant county, and the grant from the government was alleged in the answer of the defendant railroad company.   The plaintiff demurred to each answer upon the ground that the facts stated were not sufficient to constitute a defense.   At the hearing the demurrer was overruled, and, the plaintiff electing not to plead further, the court, holding the tax title valid, entered judgment in favor of the defendant county as against the plaintiff, and also a decree in favor of the defendant railroad company for that portion of the land claimed by the company.   Thereupon the plaintiff appealed.

The appellant, in the first instance, contends that the court erred in overruling the demurrer to the answer of the county and in rendering a judgment by which the tax title was sustained.   It is insisted that, in the assessment of the property and notice of publication, the description given was insufficient, and not such as to impart notice of the assessment and sale to the owner; that the sale of the property under such an assessment and notice was null and void; and that therefore the title acquired by the county as a result of such assessment and sale was null and void.   It is further insisted that the fees charged by the officers in making the two sales set

out in the pleadings were in each instance in excess of those allowed by law, and that such excessive fees rendered the sales void.

The assessments which resulted in the sales were made in the years 1891 and 1893, and the descriptions of the property, as appears from the assessments, were, respectively, as follows: "Pt. N. E. quarter of Sec. 26, Township 1, North, Range 1 West Salt Lake Meridian," and, "In N. W. quarter of N. E. Quarter of Sec. 26, Township 1 North, Range 1 West, Salt Lake Meridian. No. of acres, 7, more or less." It will be observed that under these descriptions the land in question might have been located in any part of the larger tract mentioned. Its location was left wholly uncertain and indefinite. Such descriptions are calculated to mislead the owner of the premises, and do not comply with the requirements of the law. At the time the assessments in controversy were made, it was incumbent upon the assessing officer to describe real property with reasonable certainty, as to locality and quantity. 1 Comp. Laws Utah 1888, section 2013. A proper description of the real estate to be taxed, in the assessment and notice of sale, was a prerequisite to a valid sale. Where, therefore, as in this instance, the assessor failed to describe the land as required by law, all the subsequent proceedings under the assessment were null and void. It follows that the defendant county acquired no title to the land by virtue of the tax sale. This court, as to similar descriptions of real estate in assessments for the purposes of taxation, and as to tax sales made under such erroneous assessments, has held likewise on several occasions. In Olsen v. Bagley, 10 Utah 492, 495, 37 Pac. 739, 740, it was said: "Tax sales are made exclusively under statutory power, and, unless all the necessary prerequisites of the statute are carried out, the tax sale becomes invalid. If one of the prerequisites fail, it is as fatal as if all failed. The power vested in a public officer to sell land for the nonpayment of taxes is a naked power, not coupled with an inter-

est, and every prerequisite to the exercise of the power must precede its exercise. The title to be acquired under statutes authorizing the sale of the land for the nonpayment of taxes is regarded as *stricti juris,* and whoever sets up a tax title must show that all the requirements of the law have been complied with." Eastman v. Gurrey, 15 Utah 410, 49 Pac. 310; Hamer v. Weber County, 11 Utah, 16, 37 Pac. 741.

As appears from the record, these sales were also invalid because of excessive fees collected by the officers in charge of the proceedings. In the one sale the fees were $7, and in the other $6.50. Under the law in force at the time of the sale, the fees of the officer making the sale, even allowing for a certificate of sale like those appearing in the record, each of which contains about 12 folios, and for publication and filing of the certificate, would amount to $4 for each sale. 1 Comp. Laws Utah 1888, section 2030; Sess. Laws 1892, p. 30, section 2030a. The exacting of such unlawful and unreasonable fees, as in this instance, is clearly contrary to law, regardless of whether the certificates of sale contain a number of folios amounting to the sums charged. Section 2031, 1 Comp. Laws Utah 1888, in force at the time of the sales herein, so far as material here, provides: "When real estate is sold for taxes, the collector shall issue a certificate to the purchaser, reciting substantially the facts of the nonpayment of the tax levy upon, advertisement and sale of said real estate." Respecting this provision of the statute, and certificates of sale issued thereunder in the dissenting opinion in Hamer v. Weber County, 11 Utah 22, 23, 37 Pac. 747, which opinion was held in Eastman v. Gurrey, supra, to be a correct statement of the law which should govern such cases, it was said: "It will be observed that there are but four facts which shall be substantially recited in the certificate—the nonpayment of tax, the levy, the advertisement, and the sale. The statute provides no form, and the collector is therefore entitled to exercise a reasonable discretion in creating and

adopting such a form as will enable him to comply with
the statute. This discretion, however, will not permit
him to insert unnecessary words and sentences into the
form, or to recite facts therein not required by the terms
of the statute, and charge fees for the same. While the
collector will not be held to the strictest rules of propri-
ety in the use of language, yet unnecessary repetition
should be avöided, and the form should be reasonably
concise. In the case at bar, as appears from the record,
the form contains 12 folios, and yet the statute requires
the reciting of but four facts in the certificate. An ex-
amination of it shows it to be of unreasonable and unnec-
essary length, and an infringement upon the rights of
the taxpayer, who is to pay for the superfluous verbiage
at the rate of 25 cents per folio. This is such an abuse
of discretion as will authorize a court to interfere, as
unwarranted under the law.''

It thus clearly appears that the tax title relied upon
by the defendant county is void, not only because of the
want of a proper description of the real estate in assess-
ing it, but also because of the excessive charges of fees
for the making of the sales. The court therefore erred
in rendering judgment in favor of defendant county.

The appellant also contends that the court errone-
ously overruled the demurrer and entered the decree in
favor of the defendant railroad company, and insists
that the government grant under which that com-
pany claims its title did not include any part of the
land in controversy. The grant was made by the
act of Congress approved December 15, 1870 (16 Stat.
395), which act, in section 1, provides: ''Be it enacted by
the Senate and House of Representatives of the United
States of America in Congress assembled, that the
right of way through the public lands be, and the same
is hereby, granted to the Utah Central Railroad Com-
pany, a corporation created under the laws of the Legis-
lative Assembly of the Territory of Utah, its successors
and assigns, for the construction of a railroad and tele-
graph from a point at or near Ogden City, in the Ter-

ritory of Utah, to Salt Lake City, in said Territory; and the right, power and authority is [are] hereby given to said corporation to take from the public lands adjacent to the line of said road material of earth, stone, timber, and so forth, for the construction thereof. Said right of way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad, where it may pass through the public domain, including all necessary ground for station buildings, work-shops, depots, machine-shops, switches, side-tracks, turn-tables, and water stations; provided, that within three months from the passage of this act the said Utah Central Railroad Company shall file with the Secretary of the Interior a map to be approved by him, exhibiting the line of the railroad of said company, as the same has been located and constructed; provided further, that said company shall not charge the government higher rates than they do individuals for like transportation and telegraphic service. And it shall be the duty of the Utah Central Railroad Company to permit any other railroad, which has been or shall be authorized to be built by the United States, or by the Legislature of the Territory of Utah, to form running connections with its road on fair and equitable terms." Section 3 reads: "And be it further enacted, that said Utah Central Railroad shall be a post route and a military road, subject to the use of the United States for postal, military, naval and all government service, and also subject to such regulations as Congress may impose restricting the charges for such government transportation." It will be noticed that the right of way granted over the public domain to the Utah Central Railroad Company by the provisions of section 1 is "for the construction of a railroad and telegraph from a point at or near Ogden City, in the Territory of Utah, to Salt Lake City, in said Territory." The appellant insists that the language thus employed in this provision of the act granted the right of way only from Ogden City to the northern boundary line of Salt Lake City, and did not include a right of way

over the public lands lying within the city limits of the latter city; that, when Congress fixed one of the boundaries of the right of way by the use of the words "to Salt Lake City," the boundary meant was the legal boundary of the city; that the word "to," as thus employed, is a word of exclusion, and excluded the terminus of the railroad, which was then and is now located near the business portion and center of the city; and that since the land in controversy is situated within the city limits, south of its northern boundary, and north of the terminus of the road as it then existed, no title to a right of way over it passed under the grant. The appellant assumes this position notwithstanding that the railroad had been constructed over the land in question to its railway station in the city before the passage of the act, and has cited and relies upon a number of cases which hold, in effect, that, when the word "to" is used in describing premises, it is a word of exclusion, unless by necessary implication it is manifestly used in a different sense. Admitting that those cases declared the law correctly, the question then is, was the word "to" used as a term of exclusion in this case? Doubtless in one sense it was, for clearly the grant does not extend to the public domain southward from Salt Lake City. When then, Congress used the term "to Salt Lake City," the city was designated as the southern boundary of the right of way; and the precise question is whether it was the intention of the lawmakers to limit the grant to the northern boundary of the city, or to extend it to the station buildings to which the railroad had already been constructed and was being operated. The intention of Congress, whatever language may have been employed to express it, must prevail. To ascertain such intention, in addition to what appears from the context, it is proper and important to take into consideration the then existing circumstances, the conditions of the country, and the general nature and purpose of the grant. We have a right to assume that, at the time of the passage of the act, Congress was aware that the railroad

had been constructed to the station in the city over public lands within the city limits. This, indeed, appears from the context, for it is provided that within three months from the passage of the act the railroad company shall file with the Secretary of the Interior a map showing the line of railroad, ''as the same has been located and constructed;'' thus showing that the lawmakers had in mind the railroad as it was actually located. The land in controversy was then a part of the public lands within the city limits over which the railroad had been constructed, and remained in such condition until September 20, 1875, when it is claimed a settlement was made thereon. The grant was not a mere gift to the Utah Central Railroad Company, but was designed to promote the interests of the inhabitants of the two cities, of the public at large, and of the general government, as well as those of the grantee. This is manifest from section 3, which provides that the railroad ''shall be a post route, and a military road,'' and shall be subject to any government service and to government regulations. That all such legislation by Congress was designed to enhance the interests of the government, as well as to aid such enterprises, is apparent from the terms of the various grants for railroad purposes. At the times when the several acts in aid of intermountain and transcontinental railroads were passed, there were yet immense tracts of public lands unsettled and uncultivated. Although possessing a soil of surpassing richness and situate in a healthful climate, these lands were without the pale of civilization, with little prospect of reclamation from their wild state, in the absence of proper facilities for travel and for transportation of the products of the soil. Doubtless recognizing the fact that railroads are most powerful instruments to promote civilization and to upbuild a country, Congress intended by adopting a policy of liberality in enactments of the kind under consideration to induce capital to engage in the building of such roads over the public domain, and thereby reclaim and render inhabitable and

productive a section of country hitherto almost value-less—little more than a barren waste. That the policy of the government has been productive of great public benefit can scarcely be doubted, when it is considered that vast areas of the public domain have been rendered accessible by the railroads which obtained the grants, and constitute the homes of multitudes of citizens who add materially to the public revenues, and that postal military, and other governmental service may now be carried on in this intermountain region with the same facilities as in other parts of the county. In construing acts making grants of such character, offering induce-ments to individuals or corporations to engage in such expensive quasi-public enterprises, the courts will, with-out hesitation, look into the condition of the country, the circumstances existing at the time of their passage, and the purposes to be accomplished, and will give such a construction as will carry out the designs of the lawmak-ing power. The inducements to those engaging in such enterprises are the right of way and the privileges relat-ing to material for the construction of the road. In the interpretation of the language employed in granting such a right of way and such privileges, where the in-tention of the lawmaker is to subserve the public inter-est by aiding the enterprise, more liberality will be ex-ercised than in case of a grant of a strictly private char-acter; and this with a view to effectuate the object of Congress. "The acts making the grants," says Mr. Jus-tice Field, "are to receive such a construction as will carry out the intent of Congress, however difficult it might be to give full effect to the language used if the grants were by instruments of private conveyance. To ascertain that intent, we must look to the condition of the country when the acts were passed, as well as to the purpose declared on their face, and read all parts of them together." Winona & St. Peter R. R. Co. v. Bar-ney, 113 U. S. 618, 5 Sup. Ct. 606, 28 L. Ed. 1109. In United States v. Denver, etc., Railway, 150 U. S. 1, 14 Sup. Ct. 11, 37 L. Ed. 975, Mr. Justice Jackson, deliver-

ing the opinion of the court said: "When an act, oper-
ating as a general law, and manifesting clearly the in-
tention of Congress to secure public advantages or to
subserve the public interests and welfare by means of
benefits, more or less valuable, offers to individuals or
to corporations an inducement to undertake and accom-
plish great and expensive enterprises or works of a
quasi-public character in or through an immense and
undeveloped public domain, such legislation stands upon
a somewhat different footing from merely a private
grant, and should receive at the hands of the court a
more liberal construction in favor of the purposes for
which it was enacted." United States v. Chaplin, 31
Fed. 890; Railroad v. Baldwin, 103 U. S. 426, 26 L. Ed.
578. The language of the act under consideration, the
same as in other congressional acts of similar character
and purpose, is in terms of a grant *in praesenti*, and im-
ports immediate transfer of interest, and segregation of
the land embraced in the grant from the public domain.
The grant itself, to the extent of the land included
therein, operated as a reservation to any patent based
upon subsequently acquired rights, issued for any por-
tion of the public lands across which the right of way
extends, even though no reservation may appear in ex-
press terms in such patent. Northern Pac. Ry. Co. v.
Townsend, 190 U. S. 267, 23 Sup. Ct. 671, 47 L. Ed.
1044; Railroad Co. v. Baldwin, 103 U. S. 426, 26 L. Ed.
578. The present grant not only includes a right of way
over the public lands lying between the two cities men-
tioned, but also, as has been seen, "all necessary ground
for station buildings, work-shops, depots," etc., and im-
poses the condition, among others, that the railroad
"shall be a post route and a military road, subject to the
use of the United States for postal, military, naval, and
all other governmental service," and subject to congres-
sional regulations. Taking into consideration the fact
that Congress thus reserved the right to use the road to
carry the mails between the designated cities for the ac-
commodation of the inhabitants of those cities and the

public in general, and for other public service, and considering the further fact that at the time of the passage of the act the railroad had already been constructed from Ogden City to the depot in Salt Lake City over the land in dispute, which was then a part of the public domain, and looking to the condition of the country in which it was, and to the purposes of the government manifest from this and other similar legislation, would the court be justified in holding that Congress, by the use of the word "to" intended to grant the right of way only from Ogden City to the northern boundary of Salt Lake City, and not to the railroad depot in the city? Can it be reasonably assumed, in the face of the language of the act, showing a clear intention to accomplish a public service and secure a public advantage and benefit, and of the then existing conditions and surrounding circumstances, that Congress intended that the railroad, which was to be subject to the use of the United States for governmental service, should stop at that boundary line, although the inhabitated portion of the city was several miles distant, and the land lying between that line and such inhabited portion was unoccupied public land? We think not. Neither the context nor the purposes of Congress warrant the construction of the act insisted upon by the appellant. By the phrase "to Salt Lake City," Congress evidently meant the inhabited portion of the city, where the station buildings were located, without reference to the artificial line which marked its territorial limits. That phrase was employed in the act in the same sense in which it is ordinarily used in common parlance with reference to the city. When Mr. A. says, "I am going to Salt Lake City," he does not mean that he is simply going to the line that marks its territorial limits, but that he is going into the city where the people live. The fact that the land in controversy was situate within the corporate limits of the city is immaterial, since it then constituted a part of the public domain.

We do not deem it important to discuss any other question presented.

The case, as between the appellant and the respondent Salt Lake county, must be reversed, with costs to the plaintiff, and with directions to the court below to enter judgment in favor of the appellant; and the decree and judgment in favor of the respondent railroad company must be affirmed, with costs against the appellant. It is so ordered.

BASKIN, C. J., and McCARTY, J., concur.