2010 UT 4

**Glen C. WEISER, Plaintiff and Appellant,**

v.

**UNION PACIFIC RAILROAD COMPANY, Defendant and Appellee.**

**No. 20080124.**

Supreme Court of Utah.

Feb. 5, 2010.

Rehearing Denied May 24, 2010.

Steven W. Call, Elizabeth M. Peck, Salt Lake City, for plaintiff.

J. Clare Williams, Jeffery J. Devashrayee, Reha Deal, Salt Lake City, for defendant.

WILKINS, Justice:

## INTRODUCTION

¶ 1 In this direct appeal we are asked to determine the effect of a filed but unperfected pre-emption claim on the conveyance of property to the Utah Central Railroad Company under a perfected right-of-way grant by Act of Congress in 1870. Under federal law, a general right-of-way grant to a railroad is effective against pre-emptions that have only attached, but not against those that are perfected. In this case, the railroad grant is superior to the individual pre-emption claim advanced by Weiser. Accordingly, we affirm the decision of the district court finding ownership in favor of Union Pacific.

## BACKGROUND

¶ 2 Plaintiff Glen C. Weiser and defendant Union Pacific Railroad dispute ownership of a tract of land in Davis County, Utah (the Property). Weiser's ownership claim originates from a federal land patent to the Property received by his most remote predecessor-in-interest, George Tomlinson, issued by President Ulysses S. Grant on September 25, 1873. Prior to receiving the patent, and pursuant to the federal Pre-emption Act of 1841, Tomlinson filed a Declaratory Statement of Pre-emption on April 17, 1869. Final proof of pre-emption, including payment, was completed by July 6, 1872.

¶ 3 Union Pacific's ownership claim also originates from a federal land grant. Be-

tween May 1869 and January 1870, Union Pacific's predecessor-in-interest, the Utah Central Railroad Company (Utah Central), built a railroad line from Ogden to Salt Lake City in the Utah Territory. On December 15, 1870, Congress passed an Act (the Act, the Grant or the 1870 Railroad Grant) granting Utah Central "a Right of Way through the public Lands for the Construction of a Railroad and Telegraph ... to the extent of two hundred feet in width on each side of said railroad where it may pass through the public domain." This description directly overlays nearly all of the Property. As a condition to the Grant, the Act required Utah Central, within three months of passage of the Act, to "file with the Secretary of the Interior a map to be approved by him, exhibiting the line of the railroad" and to confirm acceptance of the terms and conditions. The Act was passed on December 15, 1870, and Utah Central was required to meet the conditions by March 15, 1871. Utah Central submitted its acceptance of the terms and conditions on March 2, 1871, and submitted a map on March 6, 1871. Although the Act did not require certification, the Secretary of the Interior rejected the map because it was not certified. Utah Central then submitted a certified map, which the Secretary received on March 29, 1871 and subsequently accepted.

¶ 4 In 1935, the District Court for Davis County entered a final judgment and decree that quieted title to the Property in favor of another of Weiser's predecessors-in-interest. At that time, the Railroad did not have any recorded interest in the Property on the Davis County or State of Utah records, and was not included as a party to the action.

¶ 5 In 1982, Union Pacific began construction of a semi-truck loading facility on the Property, of which Weiser became aware in 1987. Weiser requested in writing that Union Pacific surrender and vacate the Property, supported by a title report showing Weiser to be the record owner to the Property in fee simple. Union Pacific refused, and Weiser commenced an action in 1991 to obtain possession of, and quiet title to, the Property, as well as bringing other state law claims.

¶ 6 In September of 2002 the Utah Transit Authority (UTA) purchased the Property from Union Pacific pursuant to an appropriation by the Utah Legislature to the Utah Department of Transportation for a commuter rail corridor.

## PROCEDURAL HISTORY

¶ 7 Weiser filed this action in 1991. In 1995, the district court granted Weiser's motion for partial summary judgment, finding that the 1870 Railroad Grant was a nullity due to failure to meet the conditions of the Grant. The district court denied Union Pacific's motion to reconsider, and this court dismissed Union Pacific's appeal for lack of jurisdiction. See Weiser v. Union Pac. R.R. Co., 932 P.2d 596, 597–98 (Utah 1997). In 2000, Union Pacific again sought reconsideration of the grant of partial summary judgment, based on prior case law affirming the validity of the Railroad Grant in regard to other landowners. The district court granted the motion to reconsider, reversed its prior ruling, and thereafter granted Union Pacific's motion for summary judgment. In doing so, it felt compelled by the doctrine of stare decisis to change its decision. Citing the United States Supreme Court decision in United States v. Northern Pacific Railroad Co., 177 U.S. 435, 20 S.Ct. 706, 44 L.Ed. 836 (1900), the district court held that "lapse of a Land Grant statute before the filing of a profile map only authorizes the federal government to seek forfeiture of the railroad Land Grant" and does not automatically void the Grant. Because the federal government had not challenged the Grant, and had expressly accepted the late-filed map, the district court held that the federal government made effective the land grant in Utah Central Railroad. Further, the district court held that title to the Property received by Weiser's predecessor through federal patent was "of no effect" because it was subsequent to the effective date of the land grant. In so ruling, the district court rejected Weiser's arguments that res judicata and collateral estoppel prevented the court from reversing its own previous ruling.

¶ 8 As part of its rulings on the summary judgment motions, the district court also con-

cluded that Utah Central received not merely a right of way, but a limited fee interest in the Property, subject to reverter back to the federal government if Utah Central or its successors used the Property for an unauthorized purpose. In addition, the district court concluded that the quiet title decree of 1935 was of no effect because a state law action could not circumscribe the rights granted to Utah Central by the United States under the 1870 Railroad Grant. The court also held that sale of the Property to UTA did not trigger reversion because federal law allows a railroad to transfer right-of-way property for similar use to a state department of transportation or its nominee, which it determined UTA was.

¶ 9 On December 5, 2005, the district court held an evidentiary hearing wherein it rejected evidence proffered by Weiser on the issue of pre-emption. Weiser asserts that the proffered evidence would have shown that his predecessor, Tomlinson, filed his declaration of pre-emption against the Property before the Grant to Utah Central was enacted by Congress, thus preserving his rights in the Property and removing it from public land and therefore not subject to the 1870 Railroad Grant. However, the district court refused to consider the evidence, ruling that because the effective date was that of the land patent, not the date of the declaration of pre-emption, the evidence regarding the date of the declaration and steps toward pre-emption was irrelevant. The court did allow Weiser to proffer the evidence for purposes of the record.

¶ 10 Ultimately, on December 21, 2007, the district court entered final judgment determining that Weiser had no remaining interest in the Property and that the Property belonged to Union Pacific. Accordingly, the district court dismissed all of Weiser's state law claims with prejudice. In addition, the court dismissed Union Pacific's claim that it had obtained title to the Property through adverse possession, holding that Union Pacific's interest in the Property lay solely in the federal land grant.

¶ 11 In January 2008, Weiser appealed the judgment of the district court. This court transferred the case to the court of appeals under Utah Code section 78A–3–102(4) (2008). The court of appeals denied motions for summary disposition by both parties. Subsequently, this court vacated the order transferring the case to the court of appeals and recalled the case.

¶ 12 On appeal, Weiser presents seven questions for review, asserting that the district court erred in (1) determining that the effective date of a claim under the Pre-emption Act of 1841 is the date the deed or land patent was conveyed as opposed to when the declaration of pre-emption was first entered; (2) refusing to receive Weiser's proffered evidence that would have established that his predecessor-in-interest had lawfully exercised his right of pre-emption before the 1870 Railroad Grant was made, thereby establishing the subject property as *not* part of the affected public lands; (3) reversing its prior summary judgment based on reliance on stare decisis instead of applying res judicata and collateral estoppel; (4) concluding that the 1870 Railroad Grant to Utah Central conveyed a limited fee interest in the subject property rather than a lesser right of way or easement; (5) determining that sale of the Property to UTA did not trigger reversion to Weiser; (6) failing to give binding effect to the 1935 district court judgment quieting title of the Property in favor of Weiser's predecessor; and (7) dismissing all of Weiser's state law claims with prejudice. We address each issue in turn.

## ANALYSIS

### I. WEISER SUFFICIENTLY PRESERVED HIS PRE-EMPTION CLAIM

■ ¶ 13 Weiser first challenges the district court's finding that the effective date of a claim under the Pre-emption Act of 1841 is the date the deed or land patent was conveyed. However, a threshold issue is whether Weiser preserved this claim for appeal. Union Pacific asserts that he did not, such that neither the district court nor the opposing party had notice of the issue or the opportunity to properly respond.

¶ 14 "To preserve an issue for appellate review, a party must first raise the issue in the trial court, giving that court an opportunity to rule on the issue." *Searle v. Searle*, 2001 UT App 367, ¶ 17, 38 P.3d 307 (internal quotation marks omitted). Further, " '[f]or an issue to be sufficiently raised, even if indirectly, it must at least be raised to a level of consciousness such that the trial judge can consider it.' " *LeBaron & Assocs. v. Rebel Enters.*, 823 P.2d 479, 483 (Utah Ct.App.1991) (quoting *James v. Preston*, 746 P.2d 799, 802 (Utah Ct.App.1987)). In this case, the district court judge had the opportunity to consider the issue, as evidenced by the conclusion of law set forth in the court's final judgment. The court stated,

> [T]he Court rejected Weiser's argument that the Property was taken out of the public lands because Weiser's original predecessor (Tomlinson) had acquired a homestead or pre-emption interest in the property. Weiser contended that Tomlinson's interest in the property was superior to the Railroad's because Tomlinson presented his Declaratory Statement of Pre-emption on April 17, 1869, *before* the Conditional Grant was approved by Congress and therefore the Property was not part of the "public lands" at the time Congress approved the Conditional Grant. Weiser contended that his position was supported by case authority. The Court rejected Weiser's arguments and concluded that the period of time for perfecting an interest in Property through the doctrine of pre-emption is determined by the date that the final proof of pre-emption was completed on July 6, 1872 and not on April 17, 1869 when Tomlinson's Declaratory Statement of Pre-emption was made. Because the Court concluded that the date of proof is the controlling date for the purpose of determining when whether [sic] the Property was part of the public lands, the Court determined that the evidence proffered by Weiser at an evidentiary hearing that Tomlinson['s] Declaratory Statement was made on the public record on April 17, 1869 (before the Conditional Grant was approved by Congress) was irrelevant.

¶ 15 As shown, the district court considered the issue of the relevant date for establishing a pre-emption claim. Although it is not apparent that Weiser presented specific legal authority for his position, the court was aware of, considered, and made an explicit ruling on the issue, noting that Weiser asserted case law authority for the proposition. As such, Weiser sufficiently preserved the issue for appeal.

## II. THE DISTRICT COURT DID NOT ERR IN HOLDING THAT TOMLINSON'S DECLARATORY STATEMENT OF PRE–EMPTION WAS INSUFFICIENT TO REMOVE THE PROPERTY FROM DISPOSITION UNDER THE 1870 RAILROAD GRANT

¶ 16 Having determined that Weiser preserved his pre-emption claim for appeal, we turn to the merits of the claim. We review statutory construction and other questions of law for correctness, according no deference to the decision of the district court. *See Reese v. Tingey Constr.*, 2008 UT 7, ¶ 6, 177 P.3d 605.

¶ 17 The 1870 Act of Congress provides that the Railroad's right of way goes through the "public lands." Thus, the validity of Weiser's claim hinges on whether the filing of a declaratory statement of pre-emption, without having paid the full purchase price, is sufficient to remove a piece of land from all the inherent vulnerabilities of land within the public domain. If Weiser's predecessor-in-interest's actions sufficiently removed the Property from the public lands, the Property would not have been subject to the 1870 Railroad Grant. If, on the other hand, the Property was not removed from the public lands, it would have passed to Utah Central under the Grant. Thus we look at the effect of the declaratory statement of pre-emption on classification of the Property as part of the public lands.

¶ 18 "The words 'public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws." *Salt Lake Inv. Co. v. Oregon Short Line R.R. Co.*, 46 Utah 203, 148 P. 439, 444 (1914), (quoting *Union Pac. R.R. Co. v. Harris*, 215 U.S. 386, 388, 30

S.Ct. 138, 54 L.Ed. 246 (1910)), *aff'd*, 246 U.S. 446, 38 S.Ct. 348, 62 L.Ed. 823 (1918). In contrast, "under the general land laws of the United States one who, having made an entry, is in actual occupation under the pre-emption or homestead law cannot be dispossessed of his priority at the instance of any individual." *Union Pac. R.R. Co. v. Harris*, 215 U.S. 386, 389, 30 S.Ct. 138, 54 L.Ed. 246. Thus, public lands to which a homestead or pre-emption claim has attached, through the filing of a declaratory statement, are no longer subject to sale. Indeed, " 'lands originally public cease to be public after they have been entered at the land office and a certificate of entry has been obtained.' " *Whitney v. Taylor*, 158 U.S. 85, 90, 15 S.Ct. 796, 39 L.Ed. 906 (1895) (quoting *Hastings & Dakota R.R. Co. v. Whitney*, 132 U.S. 357, 361, 10 S.Ct. 112, 33 L.Ed. 363 (1889)). However, public lands which have been settled or spoken for under the homestead or pre-emption acts could remain subject to other disposal under certain circumstances. In *Harris*, the United States Supreme Court stated that "the power of Congress over lands which an individual is seeking to acquire under ... the pre-emption ... law remains until ... payment of the full purchase price." 215 U.S. at 388, 30 S.Ct. 138; *see also N. Pac. R.R. Co. v. Smith*, 171 U.S. 260, 269, 18 S.Ct. 794, 43 L.Ed. 157 (1898) (explaining that the power of Congress over public lands is limited only by a vested right, which, in the context of pre-emption laws, "is only obtained when the purchase money has been paid, and the receipt of the proper land officer given to the purchaser"). Thus, although filing a declaratory statement is sufficient to remove land from being subject to individual or local disposition under "like laws," full payment is required to protect the land against disposition by Congress. *Harris*, 215 U.S. at 389, 30 S.Ct. 138 ("In other words, one who has taken land under the pre-emption or home-

stead law acquires an equity of which he cannot be deprived by any individual under the like laws.").

¶ 19 In contrast, relying on *Whitney v. Taylor*, Weiser argues that filing the declaratory statement was all that was required for Tomlinson to remove the Property from disposition by the Grant. In *Whitney*, the Supreme Court stated that "Congress ... has provided for the filing of [a declaratory statement] as the proper means for an assertion on record of a claim under the pre-emption law, and that is all that is necessary to except the land from the scope of the grant." *Whitney*, 158 U.S. at 96, 15 S.Ct. 796. However, the railroad land grant in *Whitney* expressly provided that only lands "to which a pre-emption or homestead claim may not have attached" were granted. *Id.* at 90, 15 S.Ct. 796. Further, the Court announced that "the principle to be deduced" from the case is that the filing of a declaratory statement, with subsequent acceptance and recording on the books of the local land office, is sufficient to "except[ ] [the subject tract of land] from the operation of a railroad land grant *containing the ordinary excepting clauses.*" *Id.* at 92, 15 S.Ct. 796 (emphasis added). The inclusion of such an excepting clause appears to denote a distinction between "checkerboard" land grants to a railroad that could be sold for profit, and general right-of-way grants for the railroad's own use. "Checkerboard" grants, in contrast to the continuous strip of land conveyed in a right-of-way grant, consisted of "alternate section[s] of public land ... on each side of [a] railroad," and contained clauses that excepted tracts of land to which pre-emption or homestead claims had attached. *Tarpey v. Madsen*, 17 Utah 352, 53 P. 996, 997 (1898), *rev'd on other grounds*, 178 U.S. 215, 20 S.Ct. 849, 44 L.Ed. 1042 (1900), (quoting Pac. R.R. Act, Pub.L. No. 37–120, 12 Stat. 489, 492 (1862)).[1] Right-of-

---

1. The complete language of the grant to the Central Pacific Railroad in *Tarpey* is as follows, in relevant part:

   That there be, and is hereby, granted to the said company, for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores thereon, every alternate section of public land, designated by odd numbers, to the amount of five alternate sections per mile on each side of said railroad, on the line thereof, and within the limits of ten miles on each side of said road, not sold, reserved, or otherwise disposed of by the United States, and to which a pre-emption or homestead claim may not have attached, at the time the line of said road is definitely fixed.

way grants, on the other hand, such as the 1870 Railroad Grant at issue here, do not contain such excepting language. The United States Supreme Court has explained a key difference between the two:

[T]he grant of the right of way differed from the grant of alternate odd-numbered sections in that, while both were expressed in the words of a grant in praesenti, the former was without limitation or exception, while the latter was expressly made subject to the limitation or exception that it should not include any lands ... to which a preemption or homestead claim had attached, at the date of definite location.

*Stuart v. Union Pac. R.R. Co.*, 227 U.S. 342, 353, 33 S.Ct. 338, 57 L.Ed. 535 (1913). The Court has also explained the policy behind the distinction.

The sections granted [in a checkerboard grant] could be ascertained only when the routes were definitely located. This might take years, the time depending somewhat upon the length of the proposed road and the difficulties of ascertaining the most favorable route. It was not for the interest of the country that in the mean time any portions of the public lands should be withheld from settlement or use because they might, perhaps, when the route was surveyed, fall within the limits of a grant. Congress, therefore, adopted the policy of keeping the public lands open to occupation and pre-emption, and appropriation to public uses, notwithstanding any grant it might make, until the lands granted were ascertained, and providing that if any sections settled upon or reserved were then found to fall within the limits of the grant, other land in their place should be selected. Thus, settlements on the public lands were encouraged without the aid intended

for the construction of the roads being thereby impaired.

*R.R. Co. v. Baldwin*, 103 U.S. 426, 429, 26 L.Ed. 578 (1880). On the other hand, grants of rights of way need no such qualification because "lands would not be the less valuable for settlement by a road running through them. On the contrary, their value would be greatly enhanced thereby." *Id.* at 430. In addition, a "right of way for the whole distance of the proposed route was a very important part of the aid given" because if a railroad company were "compelled to purchase its way over any section that might be occupied in advance of its location, very serious obstacles would be often imposed to the progress of the road." *Id.* Indeed, though under a checkerboard grant "any loss of lands by settlement or reservation" could be replaced by giving "other lands," under a right-of-way grant "no compensation ... could ... be given by the substitution of another route." *Id.*

¶ 20 In this case, the 1870 Railroad Grant consists of a continuous "right of way," not alternate checkerboard sections, "to the extent of two hundred feet in width on each side of said railroad where it may pass through the public domain," and does not contain any excepting language. Utah Cent. R.R. Co. Act, Pub.L. No. 41–2, 16 Stat. 395 (1870).[2] From the plain language of the statute it is therefore apparent that it is a right-of-way grant that is "without limitation or exception" and is not defeated by the filing of a declaratory statement. *Stuart*, 227 U.S. at 353, 33 S.Ct. 338. Indeed, "[h]ad a similar qualification upon the absolute grant of the right of way been intended, it can hardly be doubted that it would have been expressed. The fact that none is expressed is conclusive that none exists." *Id.*

*Tarpey v. Madsen*, 17 Utah 352, 53 P. 996, 997 (1898) (quoting Pac. R.R. Act, Pub.L. No. 37–120, 12 Stat. 489, 492 (1862)).

2. The complete relevant language of the 1870 Railroad Grant is as follows:

That the right of way through the public lands be, and the same is hereby, granted to the Utah Central Railroad Company ...; and the right, power, and authority is ... hereby given to said corporation to take from the public lands adjacent to the line of said road material of

earth, stone, timber, and so forth, for the construction thereof. Said way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass through the public domain, including all necessary ground for station-buildings, work-shops, depots, machine-shops, switches, side-tracks, turn-tables, and water-stations.

Utah Cent. R.R. Co. Act, Pub.L. No. 41–2, 16 Stat. 395 (1870).

¶ 21 Prior to the enactment of the 1870 Railroad Grant, Tomlinson had filed a declaratory statement of pre-emption. However, payment of the full purchase price, and the resulting land patent, were not completed until well after the effective date of the Grant. Accordingly, though the Property was removed from the public lands insofar as against adverse claims by other individuals, it remained subject to the power of Congress because Tomlinson did not have a vested right in the Property superior to Congress's power of disposition. Thus, Weiser's claim of ownership was preempted by the 1870 Railroad Grant, and is therefore invalid.[3]

## III. THE DISTRICT COURT DID NOT ERR IN REFUSING TO ADMIT WEISER'S EVIDENCE OF PRE–EMPTION

¶ 22 Weiser contends that it was reversible error for the district court to refuse to consider his pre-emption evidence. We analyze such an evidentiary ruling under an abuse of discretion standard. *State v. Harrison*, 805 P.2d 769, 780 (Utah Ct.App.1991).

¶ 23 Here, Weiser sought to introduce, but was merely allowed to proffer, evidence that Tomlinson complied with the initial steps for reserving a pre-emption claim, including that the declaratory statement was filed on April 17, 1869. Were the filing date the effective date of pre-emption, this evidence would have supported Weiser's ownership claim by proving proper pre-emption. However, where the district court correctly held that the relevant date occurred after the 1870 Railroad Grant, proof of the declaratory statement and other steps taken by Tomlinson toward pre-emption was irrelevant. Thus, the district court did not abuse its discretion in refusing the evidence.

## IV. THE 1870 RAILROAD GRANT WAS VALID

¶ 24 Weiser challenges the district court's grant of partial summary judgment in favor of Union Pacific, which ruling held the 1870 Railroad Grant to be valid. "An appellate court reviews a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness, and views the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600 (internal citation and quotation marks omitted). Weiser argues that the 1870 Railroad Grant is invalid because the deadline specified in the Grant lapsed before Utah Central filed and gained approval of a profile map as required. In contrast, Union Pacific argues that the timely filing of an uncertified map was sufficient to meet the condition of the Grant because the Grant did not require a certified map. We need not address this latter argument because regardless of whether the initially filed map was sufficient, the Act also required that the Secretary approve the map before the three-month deadline, which he did not. Thus, Utah Central failed to meet the required conditions before the specified deadline, as a factual matter. However, the failure had no effect on the validity of the Grant.

¶ 25 The district court correctly held that failure to meet the deadline would not result in an automatic forfeiture. Indeed, the United States Supreme Court has said that "lands granted by Congress to aid in the construction of railroads do not revert after condition broken until a forfeiture has been asserted by the United States," *United States v. N. Pac. R.R. Co.*, 177 U.S. 435, 441, 20 S.Ct. 706, 44 L.Ed. 836 (1900), and failure to meet a condition "ought not to be treated as a forfeiture, unless the language of the act

---

3. We also note that the district court concluded that the date of the land patent was the effective date for removing the property completely from the scope of the 1870 Railroad Grant. This is incorrect. As *Harris* sets forth, Congress' power of disposition over land remains only until "payment of the full purchase price." *Union Pac. R.R. Co. v. Harris*, 215 U.S. 386, 388, 30 S.Ct. 138, 54 L.Ed. 246 (1910). Once a settler has paid for his property in full, in addition to following the other requirements set forth by the Pre-

Emption Act, Congress lacks authority to remove the property from him without providing compensation. Thus, although the district court reached the correct result, we clarify that the date of full payment (including "the receipt of the proper land officer given to the purchaser," *N. Pac. R.R. Co. v. Smith*, 171 U.S. 260, 269, 18 S.Ct. 794, 43 L.Ed. 157 (1898)), not that of the resulting land patent, is the effective date for pre-emption.

be so clear and unambiguous as to admit of no other reasonable construction." *Bybee v. Or. & Cal. R.R. Co.*, 139 U.S. 663, 677, 11 S.Ct. 641, 35 L.Ed. 305 (1891). On the other hand, as Weiser points out, the 1870 Act does state that "if such acceptance and service shall not be so made, this grant shall be void." Utah Central R.R. Co. Act, Pub.L. No. 41–2, 16 Stat. 395 (1870). However, this clause is part of section 4 of the Act, referring only to Utah Central's acceptance of the "terms, conditions, and impositions" of the Act, which was to be served on the President. *Id.* The requirement of filing a map is part of section 1 of the Act, which has no express language as to the consequence of failing to meet that requirement. Consequently, failure to file an approved map by the deadline did not result in automatic forfeiture.

¶ 26 If not resulting in automatic forfeiture, then the failure must be specifically challenged to prove invalidity. Union Pacific argues that only the government has standing to challenge the Act, and as it has not done so, the Act remains valid. The United States Supreme Court has agreed, saying, "A third party cannot take upon himself to enforce conditions attached to the grant when the government does not complain of their breach." *Van Wyck v. Knevals*, 106 U.S. 360, 369, 1 S.Ct. 336, 27 L.Ed. 201 (1882). Also, when faced with a case in which a railroad failed to complete the line within the time limit provided in the granting act, the Court said that

> no one can take advantage of the nonperformance of a condition subsequent annexed to an estate in fee, but the grantor or his heirs.... And the same doctrine obtains where the grant upon condition proceeds from the government; no individual can assail the title it has conveyed on the ground that the grantee has failed to perform the conditions annexed.

*Bybee*, 139 U.S. at 675, 11 S.Ct. 641 (1891) (internal quotation marks omitted). Thus we conclude that only the government has standing to challenge its own land grant for a failed condition, and until the government does so, the Grant conveying the right of way is valid.

¶ 27 In addition, Weiser challenges the district court's conclusion that it was bound by stare decisis because the 1870 Railroad Grant has been affirmed as valid by this court and the United States Supreme Court. Though we may affirm the ruling of a lower court on any ground apparent from the record,[4] we take a moment to address this argument in order to provide clarification for future cases. The district court's conclusion was based on several cases presented by Union Pacific. First, in *Salt Lake Investment Co. v. Oregon Short Line Railroad Co.*, we upheld the 1870 Act against an individual claim to title because the individual patent, obtained through the Pre-emption Act of 1841, was itself invalid on independent grounds. 46 Utah 203, 148 P. 439, 443 (1914). However, in that case, neither the parties nor the court addressed the effect of the late map filing. We said only that "[t]he grant required acceptance and was accepted in February, 1871, at which time the Utah Central Railroad Company filed with the Secretary of the Interior its articles of incorporation and map showing the route of its road, etc." *Id.* In the subsequent appeal, the United States Supreme Court said even less about the 1870 Railroad Grant, stating only that "[t]he right of way was granted December 15, 1870," and merely affirmed the invalidity of the individual patent. *Salt Lake Inv. Co. v. Or. Short Line R.R. Co.*, 246 U.S. 446, 447–49, 38 S.Ct. 348, 62 L.Ed. 823 (1918). Similarly, in *Moon v. Salt Lake County*, we upheld the 1870 Act against an individual alleged property owner. 27 Utah 435, 76 P. 222 (1904). There, the individual argued that the subject property was not granted to the Railroad because it was within the city limits. *Id.* at 224. The court held that the Rail-

---

4. *State v. Robison*, 2006 UT 65, ¶ 19, 147 P.3d 448

("[A]n appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the [district] court to be the basis of its ruling [and] even though such ground or theory is not urged or argued on appeal by appellee, was not raised in the lower court, and was not considered or passed on by the lower court.") (quoting *Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158) (second and third alterations in original).

road's grant included land within the limits of Salt Lake City, thus the individual's ownership claim failed. *Id.* at 226. Again, the court did not specifically examine the validity of the 1870 Railroad Grant, but seemed to simply presume that it was valid. Thus, the issue of the effect of the late map filing has not been adjudicated by this or any other court, and it was error for the district court to reverse its summary judgment based on these cases. Regardless, as mentioned, this court can affirm the decision of the district court based on the independent grounds previously discussed for validity of the 1870 Railroad Grant.

¶ 28 Lastly, Weiser asserts that it was error for the district court to reject his argument that res judicata and collateral estoppel were the correct tools of analysis in reviewing these cases. However, since neither case directly addressed the validity of the 1870 Railroad Grant when considering the map filing, neither is dispositive. Consequently, we need not address the issue.

## V. THE INTEREST CONVEYED BY THE 1870 RAILROAD GRANT IS IRRELEVANT IN THIS CASE

¶ 29 Weiser alternatively argues that even if the 1870 Railroad Grant was valid, it conveyed merely a right of way or easement over the Property, not an interest in fee simple as the district court concluded. Thus he argues that his predecessor-in-interest was able to receive the remaining fee interest by patent. We review the district court's conclusions of law, including interpretations of statute, for correctness. *See Reese v. Tingey Constr.,* 2008 UT 7, ¶ 6, 177 P.3d 605.

¶ 30 The character of the 1870 Railroad Grant has not previously been determined. However, similar railroad land grants have received much attention by the United States Supreme Court and many other state and federal jurisdictions. Interpreting nearly identical language as that of the 1870 Railroad Grant, the Supreme Court explained that the term "right of way" as used in federal railroad grants prior to 1871 is " 'used to describe that strip of land which railroad companies take upon which to construct their roadbed.' That is, the land it-self—not a right of passage over it." *New Mexico v. U.S. Trust Co.,* 172 U.S. 171, 182, 19 S.Ct. 128, 43 L.Ed. 407 (1898) (quoting *Joy v. St. Louis,* 138 U.S. 1, 44, 11 S.Ct. 243, 34 L.Ed. 843 (1891)) (emphasis omitted). Five years later, the Supreme Court determined that an 1864 railroad right-of-way grant was "of a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted." *N. Pac. Ry. Co. v. Townsend,* 190 U.S. 267, 271, 23 S.Ct. 671, 47 L.Ed. 1044 (1903). It is upon this language that the district court relied in concluding that Union Pacific's interest was of a limited fee. However, in *United States v. Union Pacific Railroad Co.,* the Court clarified its interpretation, holding that because the federal government reserved the subsurface mineral rights unto itself in the grants at issue, "[t]he most that the 'limited fee' cases decided was that the railroads received all surface rights to the right of way and all rights incident to a use for railroad purposes." 353 U.S. 112, 119, 77 S.Ct. 685, 1 L.Ed.2d 693 (1957).

¶ 31 Whether the 1870 Grant should receive similar treatment is unclear. Neither of the parties cited to *Union Pacific Railroad Co.,* nor many of the subsequent cases. Further, the 1870 Grant does not explicitly exclude the subsurface mineral rights as did the grants at issue in *Union Pacific Railroad Co. Id.* at 113–14, 77 S.Ct. 685. However, we need not make the determination regarding the exact character of the 1870 Grant here. The subsurface rights in the Property are not at issue in this case; only the surface rights are affected by the parties' use of the Property. Based on the Supreme Court precedent discussed, it is clear that Union Pacific owns at the very least the "surface rights to the right of way and all rights incident to a use for railroad purposes," *Union Pac. R.R. Co.,* 353 U.S. at 119, 77 S.Ct. 685, and at most a "limited fee," *Townsend,* 190 U.S. at 271, 23 S.Ct. 671. Exactly where that interest lies along the spectrum is a question best answered in a case where that interest is at issue and the court may benefit from greater depth of briefing.

¶ 32 Further, even if Utah Central was granted less than the limited fee, the remaining interest would not have been conveyed to Tomlinson. Referring to right-of-way grants to railroad companies, the Supreme Court has said that "the land forming [a] right of way ... [is] taken out of the category of public lands subject to pre-emption and sale, and the land department [is] therefore without authority to convey rights therein" such that subsequent homesteaders (or pre-emptioners) "acquire[ ] *no interest* in land within the right of way." *Townsend,* 190 U.S. at 270, 23 S.Ct. 671 (emphasis added). Accordingly, where Utah Central perfected its grant before Tomlinson perfected his claim, Tomlinson's patent was incapable of conveying any interest in the Property. Thus, whether the Grant was of a limited fee or something less is irrelevant. Weiser's claim of ownership fails.

## VI. UNION PACIFIC'S SALE OF THE PROPERTY TO UTA DID NOT RESULT IN REVERSION

¶ 33 Weiser further contends that even if Utah Central received the Property in limited fee, the Property reverted back to the United States, and then forward to Weiser, when Union Pacific sold it to UTA. The district court rejected this argument and we review the court's legal conclusion for correctness. *See Reese v. Tingey Constr.,* 2008 UT 7, ¶ 6, 177 P.3d 605.

¶ 34 As previously discussed, the United States Supreme Court has clarified that the nature of federal right-of-way grants to railroad companies prior to 1871 are of a "limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purposes for which it was granted." *N. Pac. Ry. Co. v. Townsend,* 190 U.S. 267, 271, 23 S.Ct. 671, 47 L.Ed. 1044 (1903). Though we refrain from determining whether Union Pacific owns a limited fee interest, we do hold that Union Pacific's interest is subject to reverter. In *Townsend,* the Court interpreted an act of 1864 granting to the Northern Pacific Railroad Company "the right of way through the public lands ... for the construction of a railroad." *Id.* at 268, 23 S.Ct. 671. Based on

this language, the Court explained that "the grant was explicitly stated to be for a designated purpose, one which negated the existence of the power to voluntarily alienate the right of way or any portion thereof" and held that the grant was "made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted." *Id.* at 271, 23 S.Ct. 671. Though the Court later clarified the impact of the "limited fee" language in *Union Pacific Railroad Co.,* its clarification did not contradict the implied condition of reverter, which condition remains in force. 353 U.S. at 118–19, 77 S.Ct. 685. Thus, because the 1870 Grant contains the same language giving rise to the implied condition, whatever interest passed to Utah Central is subject to a reversionary interest in the federal government.

¶ 35 Based on this implied condition of reverter, Weiser argues that the sale by quitclaim deed to UTA terminated Union Pacific's use of the land and triggered the reversionary interest to the United States. Thus, because Weiser's predecessor ultimately received a land patent for the Property, subject to the right of way, Weiser contends that he holds the reversionary interest and became the owner upon reversion.

¶ 36 To the contrary, as Union Pacific contends, Congress has specifically authorized railroad companies to transfer their federally-granted property interests to certain local government organizations. "For the purposes of this title the consent of the United States is given to any railroad or canal company to convey to the State transportation department of any State, or its nominee, any part of its right-of-way or other property in that State acquired by grant from the United States." 23 U.S.C. § 316 (1958). Union Pacific argues, and the district court concluded, that UTA was a nominee of the Utah Department of Transportation such that the sale was authorized by federal law and did not trigger a reversion.

¶ 37 To meet the requirements of section 316, (1) the transfer must have been "[f]or purposes of [Title 23]," and (2) UTA must be "a nominee" of the Utah Department of Transportation. *Id.* Though Title 23 deals

primarily with highways and other roads, one of the enumerated purposes is to provide for the "transportation needs of the 21st Century" including "national and interregional personal mobility (including personal mobility in rural and urban areas) and reduced congestion." *Id.* § 101(b)(3)(D)(i). Certainly the public transportation projects conducted by UTA help achieve this stated purpose.

¶ 38 That UTA is a nominee of the Utah Department of Transportation is less clear. Neither statute nor case law specifically addresses what is required to be a nominee of a State department of transportation, and neither Union Pacific nor the district court explained its conclusion. However, a manual provided by the Federal Highway Administration of the United States Department of Transportation provides a hint of guidance. The manual explains the process for federal land transfers under similar federal statutes, 23 U.S.C. §§ 107(d) and 317. Specifically, section 317 provides for the transfer of federal lands for use in specific federal-aid projects and allows for transfer to "the State transportation department, or its nominee." *Id.* § 317(b). Referring to such a nominee, the federal manual suggests, "i.e. city, county, town, [or] public-private partnership." U.S. Dep't of Transp., Fed. Highway Admin., *Manual for Federal Land Transfers for Federal–Aid Projects* 1.0, (Feb. 27, 2009), available at http://www.fhwa.dot.gov/realestate/fltmanual/fltman1.htm. This language is instructive inasmuch as it suggests that a local government organization or quasi-governmental partner of a state transportation department may qualify as a nominee under the statutory language.

¶ 39 In this case, UTA is a public transit authority created under the power granted by the Utah Legislature in the Utah Public Transit District Act. Utah Code Ann. §§ 17B–2a–801 to –825 (2009).[5] UTA purchased the 1870 Grant right of way from Union Pacific using funds appropriated by the Utah Legislature during the 2000 General Session that were appropriated to the Utah Department of Transportation with "the intent . . . that the Utah Transit Author-

ity shall: (1) continue to develop a regional commuter rail project proposal, . . .; (2) include use of the Union Pacific right-of-way in the commuter rail right-of-way acquisition; (3) coordinate the project with the Utah Department of Transportation, local governments, and interested citizens." S.B. 1, 53rd Leg., Gen. Sess. (2000). We find it significant that the legislature would appropriate funds *to* the Utah Department of Transportation *for use by* UTA in developing a regional commuter rail project and believe it indicates the type of relationship indicative of a "nominee" of a state department of transportation. Thus, where UTA is a local governmental entity that cooperates with and receives state funding through the Utah Department of Transportation, and its operations are congruent with the overall purpose of the statute, we deem it a nominee of the state department of transportation for purposes of section 316 of title 23 of the United States Code. As a result, Union Pacific's transfer to UTA was under proper federal authority and did not trigger a reversion.

¶ 40 We also note that even had the sale triggered a reversion, the property interest would not have reverted to Weiser, but to the United States. As aforementioned, the Supreme Court has said that "the land forming the right of way therein was taken out of the category of public lands subject to pre-emption and sale" such that subsequent homesteaders (or pre-emptioners) "acquire[ ] no interest in land within the right of way." *Townsend,* 190 U.S. at 270, 23 S.Ct. 671. When the 1870 Railroad Grant went into effect, it thereby eliminated any claim of interest Weiser's predecessor Tomlinson had in the Property, since the interest was not then perfected. The interest could not be after-perfected as to the Property because Tomlinson received no interest under his patent in the first instance, not even a reversionary one.

### VII. THE 1935 QUIET TITLE JUDGMENT WAS OF NO EFFECT

¶ 41 Weiser further contends that because a Davis County District Court

---

**5.** Originally codified at Utah Code Ann. §§ 11–20–1 et. seq. (1969), the Utah Public Transit District Act was renumbered and amended in

1990 and again in 2007, and we cite to the current version.

quieted title to the Property in his predecessor-in-interest, under the doctrine of res judicata the issue of ownership is now barred from being re-litigated. However, "whatever incidents or rights attach to the ownership of property conveyed by the government will be determined by the States, subject to the condition that their rules do not impair the efficacy of the grants or the use and enjoyment of the property by the grantee." *N. Pac. Ry. Co. v. Townsend*, 190 U.S. 267, 270–71, 23 S.Ct. 671, 47 L.Ed. 1044 (1903) (quoting *Packer v. Bird*, 137 U.S. 661, 669, 11 S.Ct. 210, 34 L.Ed. 819 (1890)). Where the district court's quiet title judgment purported to limit the ownership interest of the Railroad as granted by the federal government, it was of no force or effect and cannot therefore have a binding effect on the parties before us.

## VIII. WEISER'S STATE LAW CLAIMS WERE PROPERLY DISMISSED

¶ 42 Weiser lastly argues that the district court improperly dismissed his state law claims with prejudice. In his brief, Weiser specifically urges the merit of his claims for forcible detainer, trespass, and unjust enrichment. However, the success of each of these claims is predicated upon Weiser's ownership of the Property. Where we have concluded that the district court correctly found that Weiser does not own the Property, Weiser's state law claims necessarily fail and it was not error for the district court to dismiss them with prejudice.

## CONCLUSION

¶ 43 The relevant date for preempting a piece of land from the scope of a federal railroad grant depends on the type of grant. If the federal grant is a general right of way, employing no excepting language, a pre-emption claim that has attached, but has not been perfected by full payment, is insufficient to remove it from the effect of the grant. As the 1870 Railroad Grant is for a right of way and does not employ excepting language, and where Weiser's predecessor had not yet perfected his title, the attachment of the pre-emption claim did not prevent the Property from passing to Utah Central upon enactment of the Grant. Thus, although full payment, not receipt of a patent, was the proper date for pre-emption, the district court properly held that Utah Central's interest was not preempted by Weiser's predecessor. Accordingly, it was not error for the district court to reject Weiser's evidence on the issue.

¶ 44 In addition, although Utah Central failed to file the accepted map within the stated deadline, only the federal government has standing to challenge the failure, which it has not done. Further, our previous case law upholding the 1870 Railroad Grant presumed its validity without deciding the effect of the late-filed map. Thus, although the district court was not bound by stare decisis, it correctly held the Grant to be valid.

¶ 45 Next, we vacate the district court's conclusion that the 1870 Railroad Grant conveyed an interest in limited fee, and hold only that the interest was of a corporeal nature somewhere between mere surface rights and a limited fee. Nonetheless, this interest was made subject to reversion if Utah Central or its successors failed to use the Property for the purpose stated in the Grant. Congress has since given permission for a railroad to convey its granted interest to a state department of transportation or its nominee. UTA is the apparent nominee of the Utah Department of Transportation, thus its purchase of the Property did not trigger reversion. And in any event, Weiser does not hold a reversionary interest.

¶ 46 Further, the district court was correct in holding that the 1935 quiet title decree was invalid because the district court did not have authority to circumscribe the rights properly granted by Congress through the 1870 Railroad Grant.

¶ 47 Finally, Weiser's state law claims are predicated upon his ownership of the Property. The district court properly held that Weiser does not have ownership of the Property, and the court was therefore correct in dismissing his state law claims with prejudice.

¶ 48 Affirmed in part and vacated in part.

¶ 49 Chief Justice DURHAM, Associate Chief Justice DURRANT, Justice PARRISH, and Justice NEHRING concur in Justice WILKINS' opinion.